# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **CHARLES GREGORY CLARK,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION 16-0454-WS-C** |
| | ) |
| **JEFFERSON S. DUNN, etc.,** | ) |
| | ) |
| **Respondent.** | ) |

## ORDER

This matter is before the Court on the petitioner's amended petition for writ of habeas corpus. (Doc. 13). The parties have filed briefs in support of their respective positions, (Docs. 13, 52, 55, 57),[1] and the petition is ripe for resolution. After carefully considering the foregoing and all other relevant materials in the file,[2] the Court concludes that the petition is due to be denied in its entirety.

## BACKGROUND

On the morning of February 14, 1998, the petitioner killed William Fuller Ewing at Ewing's gas station/convenience store on Fort Morgan Road in Baldwin County. The petitioner was convicted of capital murder under Section 13A-5-40(a)(2) of the Alabama Code ("Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant."). The trial judge imposed the death penalty after the jury, by a vote of 11-1, recommended that

---

[1] The Court permitted the respondent to file a surreply as to a single issue first raised by the petitioner in his reply brief. (Doc. 56). To the extent the respondent's surreply addresses other matters, the Court does not consider it.

[2] This includes the submitted record, (Docs. 15-49), as well as the unsealed trial exhibits received from the Baldwin County Circuit Court.

sanction. The Alabama Court of Criminal Appeals ("CCA") remanded for additional written findings and possible resentencing.[3] The trial judge did not alter the sentence and, on return from remand, the CCA affirmed the conviction and sentence.[4] The Alabama Supreme Court denied a petition for writ of certiorari.[5] The Supreme Court thereafter also denied certiorari,[6] concluding the petitioner's direct appeals.

The petitioner began his collateral attack on his conviction and sentence by a petition filed under Alabama Rule of Criminal Procedure 32. The trial court denied relief in July 2013. The CCA affirmed,[7] and the Alabama Supreme Court denied certiorari,[8] whereupon the petitioner timely filed his federal petition. The petitioner prays for discovery, a full evidentiary hearing, and issuance of the writ. (Doc. 13 at 108).

## TRIAL EVIDENCE

The petitioner did not and does not deny that he killed Ewing. Moreover, he and the state were and are in substantial agreement regarding the evidence of events preceding and following the fatal encounter. They disagree strongly, however, over what transpired during that encounter, which was witnessed by no other person and chronicled by no recording device.

Over a period of approximately three years preceding the killing, the petitioner developed an addiction to crack cocaine, resulting in the depletion of

---

[3] *Clark v. State*, 896 So. 2d 584, 595-97 (Ala. Crim. App. 2000).

[4] *Clark v. State*, 896 So. 2d 584, 597-660 (Ala. Crim. App. 2003).

[5] *Clark v. State*, 896 So. 2d 584 (Ala. 2004).

[6] *Clark v. Alabama*, 545 U.S. 1130 (2005).

[7] *Clark v. State*, 196 So. 3d 285 (Ala. Crim. App. 2015).

[8] *Clark v. State*, 196 So. 3d 285 (Ala. 2015).

most of his assets.  In the seven to ten days prior to the killing, the petitioner spent approximately $2,800 (received as an income tax refund) on crack cocaine, which he and his girlfriend, Rhonda Kenny, consumed.  On the night of February 13, 1998, the petitioner arrived at Kenny's apartment in Pensacola, Florida after smoking crack during the day, and he and Kenny stayed up all night smoking crack.  At some point during the night, the petitioner left in his truck but returned on foot.  At approximately 5:00 a.m. on February 14, 1998, the petitioner, still high on crack, borrowed Kenny's vehicle to go to Seminole, Florida.  Before leaving, he borrowed $40 from Kenny's brother-in-law.  The petitioner at some point drove to Gulf Shores, Alabama, where his mother and step-father had a beach house on Fort Morgan Road.  He pulled in to Ewing's gas station/convenience store, which was closed, and waited.

At approximately 7:20 a.m., as he drove down Fort Morgan Road past Ewing's establishment, James Iles saw an individual on his hands and knees in the parking lot and saw another individual walk towards a car parked at the gasoline pumps, enter the car and drive away.  Suspicious, Iles followed the car, got its tag number and called 911.

Law enforcement arrived at the gas station at approximately 7:45 a.m. Ewing was dead, his body on the ground facing the convenience store, his head and chest at its threshold.  He had been stabbed and cut repeatedly, and the blood extended approximately six feet outside the store.  Several drops of blood were found on the counter, and several more drops were found on the floor behind the counter, along with a pack of cigarettes impressed with a clump of human hair.  A stick with no visible blood on it was standing on end in the corner behind the counter.  A baseball-style cap was in front of the counter.  The cash register was on the floor in front of the counter, and there were loose coins on the floor and on the counter.  Ewing had over $600 in cash on his person.  A gas pump was on and reflected that $14.72 in gas had been pumped from it.  The gas hose and nozzle

were lying on the ground, and a shoeprint was discovered nearby. The cash-register tape indicated no transactions since the previous night.

Dr. Leroy Riddick, a medical examiner, found fifteen stab wounds and seventeen cuts on Ewing's body.[9] Ten of the stab wounds were to the front of Ewing's torso. The single most serious was a stab wound into the heart, but there was also a 3½-inch deep stab wound into the big right chest muscle and a stab wound that struck the sixth rib (which is located just below the level of the heart). In addition to the ten stab wounds, Ewing's torso was cut seven times – twice above the left nipple, twice at the rib cage, and three times on the side of the abdomen. Ewing also received three stab wounds in the back, two of which struck bone. His right hand was sliced over an inch deep and a separate stab wound reached bone. Ewing's face received five cuts, the most serious over an inch long and almost an inch deep, creating a flap on the lip. There was a shallow "scratch" cut on the neck that, had it gone deeper, could have cut the jugular vein. Other minor cuts were found on Ewing's back, left buttock, left flank and right arm.

Dr. Riddick concluded the wounds were most likely caused by a knife and that Ewing was alive when each wound was inflicted. The stab wound to the heart would have been fatal within minutes, but Dr. Riddick could not determine the order in which the wounds were inflicted. Dr. Riddick concluded that wounds to Ewing's hands and arms were defensive and that the small number of them indicated that Ewing and his assailant were within two feet and struggling at the time of the stabbing.

The petitioner was stopped by law enforcement on Highway 59 in Gulf Shores shortly after he left Ewing's store.[10] He had a significant amount of blood

---

[9] Dr. Riddick described a stab wound as a wound deeper than its length and a cut as a wound longer than its depth.

[10] The record does not reflect the precise time interval, but from testimony as to the petitioner's travel path and where he was pulled over, it appears he was stopped within ten to fifteen minutes after his departure.

on his hands, neck and clothes but no apparent wounds.  He also had a bald spot near the crown of his head.  Bills totaling $397 were found stuck between the two front seats, and a ski mask and that morning's *Mobile Register* newspaper were on the floor of the passenger seat.  The vehicle's gas gauge indicated a full tank, and the door to the gas tank was open.

The petitioner was arrested and taken to the Gulf Shores police station, where he waived his *Miranda* rights and gave his version of events, which was recorded on tape.  The petitioner admitted stabbing Ewing with the petitioner's hunting/skinning knife and taking Ewing's bank bag.  He agreed to take the investigators to where he had discarded these items along Fort Morgan Road, and the bag was located, still containing Ewing's checkbook.  Two knives were located along the road, either of which Dr. Riddick concluded could have been the weapon, but they had insufficient blood to allow DNA testing.  There was testimony that the hair clump appeared to match the petitioner's hair and that the shoeprint matched the soles of the boots the petitioner was wearing when arrested. A forensic expert conducted DNA testing of blood samples from the petitioner's jeans, neck and right hand and concluded that the blood was Ewing's.

The petitioner did not testify at trial, but the jury heard an audiotape of his statement to police, which was recorded about 1:00 p.m. on February 14.  The petitioner stated that the previous morning he had pawned his boat motor and his step-father's rifle and smoked the crack he bought with the proceeds.  Throughout the day he borrowed money multiple times to buy more crack, which he smoked. Some time after midnight, the truck he was driving ran out of gas in a rough neighborhood.  He had money but wanted to spend it on crack rather than gas, so he walked to Kenny's place.  Because of the hour and the neighborhood, he took with him his hunting jacket and the knife (but not the sheath) he kept in the truck. Shortly before 5:00 a.m., he borrowed Kenny's car and drove to his house in Seminole, checked the mail, then drove to Gulf Shores to go to his mother's and

step-father's beach house.  The petitioner left the beach house, noticed the car was low on gas, and stopped at Ewing's gas station, which was the closest one.

When Ewing showed up ten or fifteen minutes later, the petitioner (who had known Ewing for ten years) asked Ewing to turn on the gas pump.  Ewing did so.  The petitioner started pumping and left it running on automatic while he entered the convenience store, wearing a camouflage ball cap.  He talked with Ewing and asked for a pack of Doral 100 cigarettes, which Ewing retrieved and laid on the counter.  Ewing told the petitioner the gas was fourteen dollars and some change, which the petitioner gave him.  The petitioner noticed Ewing's money bag laying open on the cash register, the door of which was open because Ewing hadn't put the money from the money bag in the register.  Ewing gave the petitioner his change and they talked another five minutes.  When the petitioner started to walk away, Ewing asked if he was going to pay for the gas.  The petitioner said he already had.  Ewing said the petitioner had not paid and that he was going to call the sheriff's department.  The petitioner said to call because he had already paid.  Ewing came from around the counter and the two kind of tussled back and forth a little bit, pushing and shoving.

According to the petitioner, Ewing returned to behind the counter and got a stick, about 20 to 24 inches long and over an inch thick.  In the little aisle leading behind the counter, Ewing drew the stick back, and the petitioner thought Ewing was going to hit him.  The petitioner pulled out his knife, caught Ewing's hand before Ewing could hit him, and began sticking and cutting Ewing.  They fell to the floor behind the counter, rolled and fought there and in the little aisle, with the petitioner still cutting and sticking Ewing.  After this struggle broke up, Ewing walked behind the counter again and started bending over, which made the petitioner think he was going for a gun or something.  The petitioner jumped back on him and they fell to the floor, again ending up in front of the counter, the petitioner sticking and cutting, whatever he could do.  This struggle broke up enough for the petitioner to get out the door, but Ewing followed him and they

fought again for another half-minute or so, during which time the petitioner stuck Ewing one or two times. Up until then, Ewing did not seem to be hurt very badly, but those final sticks seemed to take the fight out of him and he did not struggle much after that, instead turning around and heading back toward the convenience store before collapsing about halfway between the store and the gas pumps.

The petitioner stated that he headed for his car and had almost gotten there but thought about the money bag he had seen and thought he could use it to get some more crack, so he walked back to the store – passing Ewing on the way – and retrieved the bag. The petitioner then walked to his car and passed Ewing as he was starting to get up off the ground. The last the petitioner saw Ewing before driving away, he was on one knee and reaching up for the door handle.

According to the petitioner, Ewing hit the petitioner with his fist several times, had the petitioner by the hair, and almost got the knife away from him at one point. The petitioner stated that he hated it happened and denied having any intention to rob Ewing.

The petitioner called Dr. Marianne Rosenzweig, who was accepted as an expert in psychology. Dr. Rosenzweig, who treats crack addicts, described the typical downward spiral of such persons, including both their increased use of the drug over time as drug tolerance increases and the paranoia that is commonly observed in persons consuming higher doses, during the high and also during post-high withdrawal. Such persons misread cues around them, become suspicious, and can perceive danger or bad intent from others that is not really there. After interviewing the petitioner and performing other investigation, Dr. Rosenzweig concluded that the petitioner had been exhibiting paranoia for up to two years before the killing, the paranoia increasing over time. Dr. Rosenzweig then opined that, due to the petitioner's crack dependency and his withdrawal from crack at the time of the killing, he had impaired judgment and was probably paranoid, so that he probably misinterpreted the degree of threat that Ewing posed when he advanced on the petitioner with a stick. Dr. Rosenzweig concluded from this that,

in her opinion, the petitioner did not intend to kill Ewing. On cross-examination, Dr. Rosenzweig opined that the petitioner was not insane at the time of the killing in that he knew right from wrong. She also acknowledged that the petitioner, or anyone in withdrawal from crack, could form an intent to kill.

The prosecution called Dr. Anthony DeFrancisco, who was accepted as an expert in forensic psychology. Dr. DeFrancisco offered his opinion that the petitioner was sane in that he knew right from wrong and knew what he was doing, although he also stated that a crack addict experiencing withdrawal could distort things in his mind by thinking something was right when it wouldn't be right. Dr. DeFrancisco agreed that crack can cause addicts to exhibit paranoia and hyper-vigilance, to believe things are happening that really are not happening, and to act on that incorrect belief. Dr. DeFrancisco opined that the petitioner could have premeditated the murder and robbery of Ewing but that it was equally possible the petitioner did not intend to kill or rob Ewing but was responding to distortions in his mind caused by crack. Dr. DeFrancisco further opined that Ewing's wound pattern was consistent with the petitioner's version of events and with Dr. DeFrancisco's viewpoint that the petitioner did not go in the store with the intent of just dropping Ewing. On re-direct examination, Dr. DeFrancisco conceded that it would change things if the deep stab wounds to the back happened first, before the struggle.

## GROUNDS FOR RELIEF

The petitioner identifies the following grounds for relief:

- That trial counsel was ineffective in pressing unsupportable defenses while ignoring the supportable defense that the petitioner lacked the specific intent to kill;
- That trial counsel was ineffective in declining a charge on heat-of-passion manslaughter and failing to argue it as a lesser-included offense;
- That trial counsel was ineffective in the penalty phase;

- That the petitioner's constitutional rights were violated when members of the jury saw him wearing a leg brace during trial;

- That trial counsel was ineffective in failing to challenge the use of physical restraints at trial;

- That the trial court improperly refused to find any mitigating factors or to consider unrebutted mitigation evidence;

- That trial and appellate counsel were ineffective in failing to properly challenge the trial court's treatment of mitigating factors and evidence;

- That the petitioner's constitutional rights were violated by the trial court's failure to charge the jury on heat-of-passion manslaughter;

- That the petitioner's constitutional rights were violated by the prosecutor's argument that non-convictions preclude finding the mitigating factor of no significant history of criminal activity and by the trial court's failure to properly instruct the jury on this issue;

- That the evidence that this crime was especially heinous, atrocious or cruel was constitutionally insufficient;

- That Alabama's judge-based capital sentencing scheme violated the petitioner's constitutional right to have a jury determine all facts necessary to impose a death sentence; and

- That the petitioner is entitled to discovery to prove a *Brady* violation.

## INITIAL CONSIDERATIONS

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A number of principles guide the review of such applications, and the Court pauses to lay out some of those most pertinent to the instant petition before proceeding to the petitioner's individual claims.

**I. Standard of Review.**

With respect to legal conclusions drawn by the state court, Congress has provided as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ....

28 U.S.C. § 2254(d)(1).

The "clearly established Federal law" contemplated by subsection (1) "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (internal quotes omitted); *accord Greene v. Fisher*, 565 U.S. 34, 37-38 (2011). Moreover, review under Section 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is not 'contrary to … clearly established Federal law' simply because the court did not cite our opinions." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). Indeed, "a state court need not even be aware of our precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* (internal quotes omitted).

"For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*,

562 U.S. 86, 101 (2011) (internal quotes omitted, emphasis in original).  Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Id.* (internal quotes omitted).  That is, "an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice."  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotes omitted).  "To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (internal quotes omitted).  And "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  *Harrington*, 562 U.S. at 101 (internal quotes omitted).  However, "even a general standard may be applied in an unreasonable manner."  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).

The petitioner bears the burden of showing that the state court's ruling was contrary to, or involved an unreasonable application of, controlling Supreme Court precedent.  *Harrington*, 562 U.S. at 98; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

With respect to factual findings made by a state court, Congress has declared:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
> ...
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2).  In addition:

> (e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*Id*. § 2254[e](1). The Supreme Court "ha[s] not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)," *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 (2015), although the Eleventh Circuit has hinted that the former standard is "arguably more forgiving." *Clark v. Attorney General*, 821 F.3d 1270, 1286 n.3 (11th Cir. 2016). In any event, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (internal quotes omitted).

When the state court does not adjudicate a claim on the merits, the federal standard of review is *de novo*. *Cone v. Bell*, 556 U.S. 449, 472 (2009). The same standard applies to any element of a claim that the state court does not adjudicate on the merits. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (where the state court resolved a claim of ineffective assistance of counsel based on the performance element and did not reach the prejudice element, federal review of the latter element was *de novo*).

## II. Exhaustion and Procedural Default.

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that … the applicant has exhausted the remedies available in the courts of the State ...." 28 U.S.C. § 2254(b)(1)(A). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, we conclude that state prisoners must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "To provide the State with the necessary opportunity, the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotes omitted).

An unexhausted claim is usually procedurally defaulted. "[W]e apply the familiar principle that federal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11ᵗʰ Cir. 1999). Procedural default can also arise when a claim is presented at some point, in some fashion in the state system but "the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred …." *Id*. at 1302. A procedural default is final unless the petitioner can demonstrate cause for the default and prejudice from enforcing it, or unless he can show a fundamental miscarriage of justice, which requires a threshold showing of actual innocence. *Id*. at 1306.

### III. Ineffective Assistance of Counsel.

"*Strickland v. Washington*, 466 U.S. 668 (1984), … provides the standard for inadequate assistance of counsel under the Sixth Amendment." *Premo v. Moore*, 562 U.S. 115, 118 (2011). "To establish ineffective assistance of counsel a defendant must show both deficient performance by counsel and prejudice." *Id*. at 121 (internal quotes omitted). "To establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness," and "[a] court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance."

*Id.* (internal quotes omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or common custom." *Harrington*, 562 U.S. at 105 (internal quotes omitted). The standard is "highly deferential," *id.* (internal quotes omitted), to the extent that "a petitioner must establish that *no* competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added). "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption" of competent representation. *Id.* at 1314 n.15.

To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) (internal quotes omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotes omitted). "[T]here are also situations in which it would be unjust to characterize the likelihood of a different outcome as legitimate prejudice, … because defendants would receive a windfall as a result of the application of an incorrect legal principle or a defense strategy outside the law." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012).

The interplay of *Strickland* and Section 2254(d) results in "double deference" on federal habeas review, and "[d]ouble deference is doubly difficult for a petitioner to overcome." *Johnson v. Secretary, Department of Corrections*, 643 F.3d 907, 911 (11th Cir. 2011). "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105. Thus, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Inserting the *Chandler* Court's phrasing, the question is no longer whether any competent counsel would have

taken the course the petitioner's counsel took, but whether any fairminded jurist could conclude that some competent counsel would have taken that course.

## IV. Evidentiary Hearing.

Section 2254(e)(2) "generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop the factual bases for their claims in state courts." *Schriro v. Landrigan*, 550 U.S. 465, 473 n.1 (2007). Moreover, "when the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing." *Cullen*, 563 U.S. at 183 (internal quotes omitted). Even when Section 2254(d) is not in play, "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

## ANALYSIS OF CLAIMS

In addressing the petitioner's claims, the Court numbers them as does the petitioner.

## I. Ineffective Assistance – Guilt Phase.

### A. Choice and Presentation of Defenses.

Capital murder requires a specific, particularized intent to kill. *E.g., Shanklin v. State*, 187 So. 3d 734, 795-96 (Ala. Crim. App. 2014). The petitioner asserts that his best chance to avoid conviction of a capital offense was to stress both the expert testimony indicating that he lacked an intent to kill Ewing and other evidence at odds with such an intent. Instead, the petitioner complains, his counsel focused on defenses that were each legally and/or factually unsustainable.

The petitioner identifies these defenses as: (1) insanity; (2) lack of intent to rob; and (3) self-defense. (Doc. 13 at 31). The petitioner, pointing to affidavits from three jurors stating they did not believe he intended to kill Ewing, asserts there is a reasonable probability the result would have been different had trial counsel focused on intent to kill rather than on other defenses. (*Id*. at 44, 48). The CCA determined that counsel's performance was not constitutionally deficient and that the petitioner was not prejudiced by his performance. 196 So. 3d at 303, 306-08.[11]

"[A] defendant claiming ineffective counsel must show that counsel's actions were not supported by a reasonable strategy …." *Massaro v. United States*, 538 U.S. 500, 505 (2003). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (internal quotes omitted). "Although courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions, … neither may they insist counsel confirm every aspect of the strategic basis for his or her actions [because] [t]here is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington*, 562 U.S. at 109 (internal quotes omitted).

"In light of the reasonableness standard set forth by the *Strickland* Court, our circuit maintains that constitutionally sufficient assistance of counsel does not require presenting an alternative – not to mention unavailing or inconsistent – theory of the case." *Dill v. Allen*, 488 F.3d 1344, 1357 (11th Cir. 2007). Rather, "counsel's reliance on particular lines of defense to the exclusion of others … is a matter of strategy and is not ineffective unless the petitioner can prove the chosen

---

[11] The petitioner's statement that the CCA "declined to address the prejudice prong," (Doc. 13 at 48 n.179), is incorrect.

course, in itself, was unreasonable." *Chandler*, 218 F.3d at 1318. Thus, "abandoning one defense in favor of another that counsel reasonably perceives to be more meritorious is not deficient performance." *Williams v. Allen*, 598 F.3d 778, 790 (11th Cir. 2010) (internal quotes omitted). The Eleventh Circuit has repeatedly rejected claims of ineffective assistance based on trial counsel's selection of defense theories.[12]

It is important to articulate clearly the petitioner's argument. He does not claim that trial counsel failed to perform an adequate investigation into whether he intended to kill Ewing. Nor does he claim that trial counsel failed to elicit at trial all the potentially available evidence to support an argument that he lacked the intent to kill. Nor does he claim that trial counsel failed to argue to the jury that he did not intend to kill Ewing. Instead, the petitioner claims that trial counsel's jury argument regarding this element of the state's case was insufficiently clear and forceful and that all other defense theories should have been sacrificed in order to stress and bolster this single theory.

The evidence of guilt, as summarized previously, lay heavily against the petitioner. Against this dismaying array of evidence, trial counsel testified, he decided to encourage the jury to find his client guilty of something less than capital murder. Perceiving no single strong candidate for this role, he did not lay all his eggs in any one basket but offered the jury as many bases as possible for reaching such a verdict.[13] Because both trial counsel's assessment of the situation and his selection and presentation of theories in response to it were transparently reasonable, his performance was not constitutionally deficient.

---

[12] *E.g., Williams*, 598 F.3d at 790-92; *Pace v. McNeil*, 556 F.3d 1211, 1224-25 (11th Cir. 2009); *Hardwick v. Crosby*, 320 F.3d 1127, 1161-62 (11th Cir. 2003); *Brownlee v. Haley*, 306 F.3d 1043, 1060-61 (11th Cir. 2002); *Johnson v. Alabama*, 256 F.3d 1156, 1178-81 (11th Cir. 2001); *Williamson v. Moore*, 221 F.3d 1177, 1180-81 (11th Cir. 2000).

[13] (Doc. 44-2 at 82-84).

The petitioner argues that several strands of evidence rendered a challenge to his intent to kill "highly viable": (1) the testimony of Dr. Rosenzweig that he lacked the intent to kill; (2) the testimony of Dr. DeFrancisco that he may have lacked the intent to kill; (3) testimony that Ewing was mentally slow and had difficulty making change; (4) the plug of hair pulled from the petitioner's head; (5) Dr. Riddick's testimony (a) that Ewing had few defensive wounds on his hands and arms, suggesting a struggle at close quarters, and (b) that many of Ewing's wounds were superficial or barely a scratch; (6) Dr. DeFrancisco's testimony that the wound pattern was consistent with his opinion the petitioner did not enter the convenience store with the pre-formed intent to kill Ewing; and (7) the evidence, from Iles as well as the petitioner, that Ewing was alive when the petitioner drove away. (Doc 13 at 30, 34-36).

This evidence is less impressive than the petitioner believes. Dr. Rosenzweig opined that the petitioner lacked the intent to kill, but her reason for that opinion – that the petitioner had impaired judgment and was probably paranoid and therefore probably "misinterpreted the degree of threat" posed by Ewing approaching him with a stick[14] – does not actually go to whether the petitioner intended to kill but to the separate question of what prompted him to such violence, as the petitioner himself recognizes. (Doc. 13 at 32 n.128). Moreover, the stick on which Dr. Rosenzweig's opinion depends was found standing vertically in a corner and without any visible blood – a fact that no one contends could support the petitioner's statement that Ewing came at him with a stick. Finally, Dr. Rosenzweig agreed that the petitioner "could have formed an intent to kill" without any "problem at all," regardless of his withdrawal from crack.[15]

---

[14] (Doc. 23-2 at 61).

[15] (*Id*. at 73).

Similarly, while Dr. DeFrancisco opined that the petitioner "did not go in there with the intent of I'm just going to drop you,"[16] the question is not whether the petitioner, when he crossed the threshold, already intended to kill Ewing but whether he possessed such an intent when he fatally stabbed Ewing some time later.[17] Moreover, Dr. DeFrancisco testified that it was equally possible the petitioner entered the store with the intent to kill and rob Ewing.[18] And while Dr. DeFrancisco testified it was possible the petitioner "reacted as he did … to … the perceived risk of harm … because of the effect of the cocaine on him and not because he intended to kill anyone or rob anyone,"[19] his reasoning, like that of Dr. Rosenzweig, goes to why the petitioner reacted with lethal violence, not to whether he intended his violence to be fatal. Finally, Dr. DeFrancisco opined that, "[a]t the time he did what he did, he knew what he was doing,"[20] which would encompass stabbing and cutting Ewing over thirty times, including repeated deep stabbings in Ewing's chest and back – conduct patently consistent with an intent to kill.

---

[16] (*Id*. at 100).

[17] As the jury was charged, murder occurs if the defendant "causes the death of another person and *in performing the act or acts which cause the death* of that person he intends to kill that person." (Doc. 24-2 at 12 (emphasis added)). *See* Ala. Code § 13A-6-2(a)(1) ("A person commits the crime of murder if … [w]ith intent to cause the death of another person, he or she causes the death of that person …."). Even under the former Alabama murder statute, pursuant to which the killing had to be premeditated, "[t]here need be no appreciable space of time between the formation of the intention to kill and the act of killing," and premeditation "may be formed while the killer is pressing the trigger that fired the fatal shot." *Young v. State*, 428 So. 2d 155, 158 (Ala. Crim. App. 1982) (internal quotes omitted).

[18] (Doc. 23-2 at 96).

[19] (*Id*. at 96-97; *accord id*. at 90).

[20] (*Id*. at 91).

There was evidence of Ewing's mental slowness and difficulty making change, and this could, as the petitioner asserts, make it more likely both that Ewing erroneously believed the petitioner had not paid for his gas and that this misunderstanding triggered the altercation and physical encounter. (Doc. 13 at 34). The petitioner, however, fails to explain how this evidence makes it less likely that he intended to kill Ewing. While the evidence might make it less likely that the petitioner intended to kill Ewing when he entered the store, as noted previously the question is whether the petitioner intended to kill Ewing when he repeatedly stabbed and cut him some time later.

That Ewing pulled a plug of the petitioner's hair does, as the petitioner says, support his position that "the two men had engaged in a close encounter fight." (Doc. 13 at 35). So also does Dr. Riddick's opinion that the small number of defensive wounds to Ewing's hands and arms indicates a close struggle.[21] The petitioner, however, has not explained how a close-encounter fight makes it less likely that he intended to kill Ewing when he repeatedly stabbed and cut him. To the extent the petitioner suggests the closeness of the encounter shows that "he believed Mr. Ewing was attacking him, and he was fighting him off and had no intent to kill," (*id*.), the evidence is strongly to the contrary.

Ewing was 54 years old, about 5 feet, 8½ inches tall, and about 161 pounds.[22] He had suffered a leg injury that prevented him from engaging in hard labor.[23] The petitioner, in contrast, was 40 years old, a "strong" man employed as a logger.[24] There was no evidence presented that Ewing had a violent or erratic disposition; on the contrary, he was described as so personable that he liked

---

[21] (Doc. 21-1 at 21, 24-25).

[22] (Doc. 20-1 at 197).

[23] (Doc. 21-1 at 78).

[24] (Doc. 20-1 at 105-06; Doc. 49-2).

talking to customers "as good as eating," to the extent that "[p]eople would be driving off and he'd be in the window talking to them."[25]  Moreover, years earlier Ewing had been robbed at his store at knifepoint, prompting his brother-in-law and business partner to tell him "to back off and give them [a robber] the whole place if they wanted it."[26]

The petitioner conceded in his statement that Ewing was unarmed throughout the encounter (except when he allegedly came at the petitioner with a stick) and that he stabbed and cut Ewing many times inside the store.  The petitioner also admitted that, after the parties had separated, the encounter resumed again some ten feet outside the door, with the petitioner sticking an unarmed Ewing one or two more times, whereupon he collapsed.  While it may be plausible that Ewing would come from behind the counter to confront an apparently unarmed petitioner about a $14.72 gas charge, it is utterly implausible that, after being stabbed and cut approximately thirty times (including at least three deep stabs into his chest and/or back),[27] a bleeding, weakening, unarmed Ewing would follow – and catch – the fleeing, armed petitioner in an impossible effort to collect this small sum.  What seems obvious is that Ewing was attempting to escape the petitioner, who tracked him down and continued his assault.  The closeness of the encounter most strongly indicates aggression by the petitioner, not by Ewing.

The petitioner next argues that the large number of "superficial" wounds and "scratch[es]" identified by Dr. Riddick supports his position that he was merely fighting off Ewing without any intent to kill him.  (Doc. 13 at 35).  Of the

---

[25] (Doc. 21-1 at 51).

[26] (*Id*. at 64, 70).

[27] As discussed subsequently, there were at least five deep stabs to Ewing's chest and back.  Since the petitioner says he stabbed Ewing only once or twice outside the store, at least three of these wounds must have been inflicted inside.

seventeen cuts identified by Dr. Riddick,[28] he described "at least ten" of them as "almost like a scratch," penetrating no more than 1/64[th] of an inch.[29]  The placement of the wounds, however, indicates the petitioner was attempting to inflict serious injury or worse.  Dr. Riddick located two of these wounds above Ewing's left nipple (just left of the heart); two at his rib cage; three on the side of his abdomen; and one on the side of his neck.[30]  Had the latter wound penetrated even ½" to ¾", it could have struck Ewing's jugular vein.[31]  Moreover, Dr. Riddick testified these wounds were "[l]ike either the point of the knife or the blade of the knife couldn't get in and it went along,"[32] indicating that the petitioner tried but failed to penetrate Ewing's body at these locations.

While Dr. Riddick did identify a number of wounds as "superficial," he did not use the term in the trivializing manner the petitioner suggests.  Instead, he described a superficial wound as one that "only [goes] into the skin and the fat beneath the skin" but "[does] not penetrate into a body cavity" and "doesn't strike any vital structure."[33]  The term does not mean the wound was not in a dangerous location, only that (like the cut to Ewing's neck) it did not penetrate deeply enough to compromise an underlying structure (like the jugular vein).

What remains is that the petitioner stabbed Ewing ten times in his front torso:  the knife one time traveling through his breastplate and penetrating into his heart, another time plunging 3½ inches deep into his right pectoralis major, and a

---

[28] As noted previously, Dr. Riddick described a "cut" as a wound longer than deep and a "stab" as a wound deeper than long.  (Doc. 21-1 at 8-9).

[29] (Doc. 20-1 at 199; Doc. 21-1 at 7).

[30] (Doc. 20-1 at 198; Doc. 21-1 at 6).

[31] (Doc. 20-1 at 199-200).

[32] (*Id*. at 199).

[33] (*Id*. at 197, 200).

third time hitting his sixth rib, along with seven additional stabs – "superficial" in the sense identified above but all deeper than ¼ inch and some much more so.[34] What remains is that the petitioner also stabbed Ewing three times in his back: one time into the top of his shoulder, another time hitting his scapula and then a rib, and the third time hitting another bone.[35]  Even if every other wound were ignored, these 13 stab wounds into the vital torso region make any argument that the petitioner did not intend to kill Ewing extremely problematic.  That eight cuts the petitioner dismisses as scratches were also in the potentially deadly areas of the chest, rib cage, abdomen and neck does not make the deeper wounds appear less designed to kill but more so.

Iles confirmed the petitioner's statement that Ewing was alive when the petitioner left the premises.[36]  Indeed, they agree that Ewing was not lying on the pavement but was on his hands and knees (Iles) or on one knee and reaching for the door (the petitioner).  The petitioner asserts "it is unreasonable to think that he would have left [Ewing] alive" if he intended to kill him.  (Doc. 13 at 35).  The Court agrees that is one arguable inference from this circumstance, but it is far from the only one, or the most reasonable one.  Among other alternative explanations, the petitioner could have believed or assumed that Ewing could not survive his many wounds and was moments from death (as he was).  Or the petitioner could have been too desperate to elude capture to tarry and observe (or hasten) Ewing's death.[37]  Or his intent to kill may have expired, replaced by regret or some other less violent thought.

---

[34] (*Id*. at 196-97).

[35] (*Id*. at 199-200).

[36] (20-1 at 147, 149).

[37] That the petitioner left his hat on the floor of the store, in full view and only a few feet from where he retrieved the money bag, bolsters the likelihood of this explanation for his behavior.

Whatever the marginal probative force of the petitioner's departure with Ewing still alive and the experts' limited opinions based on faulty information and reasoning, it was buried under the avalanche of other evidence discussed above, including without limitation the sheer number of Ewing's wounds, their placement, and the outdoors location of the final blows. In short, any challenge to the petitioner's intent to kill was not "highly viable" but had only weak evidentiary support that was overwhelmed by evidence of such an intent.

Trial counsel was well aware that the evidence offered "really only a hint of" an argument against intent to kill.[38] However, as part of his guilt-phase strategy to give the jury "as many opportunities as we could give them to say we're not going to kill" the petitioner,[39] trial counsel reminded the jury several times that capital murder requires a specific intent to kill, and he argued that the petitioner's crack withdrawal and Dr. DeFrancisco's testimony created a reasonable doubt as to whether the petitioner harbored such an intent.[40] The petitioner claims this approach was inadequate and that trial counsel should have examined in detail the evidence discussed above, forcefully affirmed that the petitioner did not intend to kill Ewing, and abandoned as distracting and futile any other challenge to the charge of capital murder. (Doc. 13 at 17, 31, 33-34).

For his claim to succeed, the petitioner must demonstrate that his preferred strategy was so markedly superior to that selected by trial counsel that no competent lawyer would have done as his counsel did. The Court has explored above the strength of the petitioner's challenge to his intent to kill and found it sorely wanting. The Court now turns to the other defenses presented at trial to

---

[38] (Doc. 44-2 at 82).

[39] (*Id*. at 84).

[40] (Doc. 23-4 at 14, 18-25).

evaluate their prospects relative to the petitioner's favored challenge to his intent to kill.

Capital murder, as charged in the indictment, requires the existence, at the legally relevant time, of two intents:  the intent to kill and the intent to rob. Without an intent to kill, the crime is felony murder.  Without an intent to rob, the crime is murder.  Without either, the most serious crime is manslaughter.[41]  The defense most strongly pressed by trial counsel was that the petitioner did not possess, at the legally relevant time, the intent to rob Ewing.

As noted, the petitioner said in his statement that it did not occur to him to take the money bag until after he had stabbed Ewing for the last time and had gotten almost to his car, when he remembered the bag and realized that he could use the money for crack, at which point he returned to the store and took the bag. "[A] robbery committed as a mere afterthought and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of murder-robbery …."  *Connolly v. State*, 500 So. 2d 57, 63 (Ala. Crim. App. 1985) (internal quotes omitted), *aff'd*, 500 So. 2d 68 (Ala. 1986).  Trial counsel in closing reminded the jury of the petitioner's statement and emphasized that it meant he formed an intent to rob as an afterthought, insufficient to support a conviction for capital murder.[42]

The petitioner insists that this argument was "untenable" and "not even legally supportable," on the grounds that the law requires only that the killing take place "during the robbery," (Doc. 13 at 31, 39, 41), which the jury charge defined as "in the course of the commission of or in connection with or in immediate flight from the commission of robbery."[43]  That, however, is precisely the point of trial counsel's argument:  if the petitioner did not form the intent to rob until after he

---

[41] (Doc. 24-2 at 12-21).

[42] (Doc. 23-4 at 14, 21).

[43] (Doc. 24-2 at 15).

last stabbed Ewing, then the killing did not take place in the course of committing the robbery, in connection with the commission of the robbery, or in flight from the robbery.  Alabama law is quite clear on this point:  "[A]n accused is not guilty of capital robbery-murder where the intent to rob was formed only after the victim was killed." *Connolly*, 500 So. 2d at 62.

It is true that "[t]he jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled." *Connolly*, 500 So. 2d at 63.  It is also true that "[t]he defendant's intent to rob the victim can be inferred where the intervening time, if any, between the killing and robbery was part of a continuous chain of events." *Id*. (internal quotes omitted).  But the operative words are "may" and "can"; a jury is permitted, but not required, to find that the intent to rob was formed prior to, or contemporaneously with, the killing. In short, trial counsel's challenge to the timing of the petitioner's intent to rob Ewing was not, as the petitioner claims, legally invalid.[44]

The petitioner advances no argument regarding the evidence favoring and/or disfavoring a jury finding that he formed an intent to rob Ewing only after he had finished stabbing him, so it is not clear that the Court need survey that evidence.  Nevertheless, the Court pauses to do so.

As with intent to kill, the evidence weighed heavily against the petitioner. The prosecution argued that the evidence indicated the petitioner entered the store with the intent to rob and that the physical evidence confirmed that the killing began as a robbery.  As to prior intent, the prosecution focused on three points: (1) the petitioner entered the store with an unsheathed hunting/skinning knife in

---

[44] The petitioner criticizes trial counsel's argument as foreclosed by *Carden v. State*, 612 So. 2d 509 (Ala. Crim. App. 1992), a copy of which was found in trial counsel's files.  (Doc. 13 at 31-32 & 32 n.126).  *Carden*, however, is perfectly consistent with the discussion in text; moreover, trial counsel was also aware of *Connolly*, which he argued to the trial court.  (Doc. 23-2 at 134-35; Doc. 24-3 at 6).

his pocket; (2) a hunting/ski mask was found on the passenger seat floor of Kenny's vehicle, on top of that morning's newspaper; and (3) the petitioner left Kenny's place in search of more crack and admitted he saw Ewing's money bag as a way to get more crack. As to physical evidence, the prosecution focused on three points: (1) the stab wounds in Ewing's back; (2) the finding of blood drops behind the counter, where cigarettes were kept; and (3) the clump of hair impressed against a pack of cigarettes, also found behind the counter.

The defense had colorable responses to this evidence. The petitioner stated that he put the knife in his jacket when he left his truck hours earlier because he had to walk to Kenny's apartment through a rough neighborhood. Kenny confirmed that it was cold that mid-February night,[45] so it would be reasonable for the petitioner to enter the store (after pumping gas outside) wearing the jacket, the knife still in it. The prosecution conceded the petitioner did not wear the mask, and the mere fact a newspaper was beneath it might mean nothing more than that the mask slid or was knocked from the passenger seat to the floor at some point before the petitioner was pulled over. There was no evidence the petitioner had ever robbed anyone to get money for crack. And there was evidence that Ewing was known to keep large sums of money on his person,[46] yet the petitioner did not take the more than $600 found in Ewing's pocket after his death.

The petitioner's story as to why he was at Ewing's was also plausible. He said he was low on gas, and the physical evidence confirmed he had pumped 13.3 gallons.[47] Being almost out of gas on a remote stretch of Fort Morgan Road would explain why the petitioner would wait for Ewing to show up and turn on the pumps. Having pumped gas, the petitioner would naturally enter the store to pay

_____

[45] (Doc. 20-1 at 103).

[46] (Doc. 21-1 at 58-59, 70, 74).

[47] (State's Exhibit 9).

for it.  And because the petitioner smoked,[48] it is unremarkable that he would ask for a pack of cigarettes.

As for the physical evidence of the encounter, Dr. Riddick could not determine the order in which the wounds were inflicted.[49]  Neither, for that matter, could the prosecutor.  In his initial closing argument, he asserted that the stabs in the back occurred at the end of the encounter; only in his rebuttal did he suggest they occurred first, when Ewing turned to retrieve the cigarettes.[50]  The blood drops behind the counter could have been left there when Ewing returned to that area to retrieve (as the petitioner says he believed) a gun.  The clump of hair could have been taken from the petitioner after Ewing confronted him and been randomly tossed, slid or otherwise moved in the course of the altercation to the location it was found.

The Court does not suggest a jury was likely to view the evidence this benignly.  Nor does the Court suggest there were not additional problems with the defense – including evidence the petitioner had not paid for his gas and the lack of blood patterns on the floor (or on the petitioner) consistent with the petitioner's version that he and Ewing rolled and fought on the floor.  The latter issues (and others), however, also plagued any challenge to the petitioner's intent to kill.  The point of the foregoing discussion is that a challenge to the petitioner's intent to rob was not hopeless – or, more precisely, was no more hopeless than a challenge to his intent to kill.

Trial counsel obtained jury charges on two affirmative defenses:  self-defense and insanity.  The petitioner argues that these defenses had no possibility of success and should have been omitted entirely.  The Court agrees the defenses

---

[48] (Doc. 21-1 at 182).

[49] (*Id*. at 22-23).

[50] (Doc. 23-3 at 24; Doc. 24-1 at 5).

were very weak,[51] but it does not follow that no competent counsel would have offered them. As noted, trial counsel's strategy was to present the jury as many ways as possible to avoid a verdict of guilty on the capital murder charge, and these defenses offered two additional ways for jurors to rationalize a guilty verdict on a lesser-included charge.[52] As the Court has noted:

> Although the affirmative defense of insanity faced its own obstacles, nothing required counsel to present only one of two problematic defenses. Indeed, in such a situation counsel may well improve the chances the jury will return a favorable verdict by offering two rationales for doing so – a prospect enhanced further by the possibility the jury can agree on the outcome while disagreeing on the rationale.

*Williams v. Campbell*, 2007 WL 1098516 at *13 (S.D. Ala. 2007). The petitioner complains that the defenses "confused the issue," (Doc. 13 at 31), but without explaining how this could have occurred. Given that trial counsel did not mention either defense in his opening statement; did not mention self-defense in his closing; and mentioned insanity in his closing only to assure the jury he was not asserting that crack rendered his client legally insane but rather that it impaired his judgment,[53] the Court can discern no risk of damaging confusion, and certainly no risk sufficient to compel counsel to abandon these options altogether.

---

[51] The only weapons identified by the petitioner were a stick and a gun. Ewing's stick was found standing upright against a wall behind the counter, with no indication it had been involved in the encounter and with no reasonable explanation how or why it could have been so involved and then returned to its resting place in the midst of, or after, the encounter. The petitioner conceded Ewing did not have a gun, only that the petitioner thought he might be reaching for one. Both experts opined that the petitioner was sane at the time of the killing, although the state's expert waffled on this point.

[52] For example, even if the petitioner's crack use and withdrawal did not render him legally insane, there was evidence from both experts that it impaired his judgment, which could have persuaded some jurors to treat him more leniently.

[53] (Doc. 23-4 at 24-25).

In summary, trial counsel did not perform in a constitutionally deficient manner by raising four defenses and emphasizing lack of intent to rob rather than raising only one defense, that of lack of intent to kill.

The petitioner suggests that, even if it was not deficient performance to challenge his intent to rob, trial counsel's jury argument mangled that challenge even as it marginalized his argument regarding intent to kill. (Doc. 13 at 33-43). He identifies three ways in which trial counsel's treatment of intent to rob was problematic: (1) he relied on a legally indefensible "afterthought" argument; (2) he dwelled too long on the ski/hunting mask; and (3) he told the jury that theft would not support capital murder but only robbery (even though he admitted he was unsure of the difference), yet the trial judge identified theft as an element of the offense. (*Id*. at 38-41).

As discussed above, "afterthought" was not legally indefensible but was a correct statement of Alabama law; exactly as trial counsel argued, if the jury found the petitioner formed the intent to rob only after he last stabbed Ewing, he could not be guilty of capital murder. Trial counsel reasonably addressed the ski/hunting mask, because the prosecutor could (and did) argue its location on top of the newspaper showed that the petitioner, as he awaited Ewing's arrival, intended to rob him while wearing a mask to avoid recognition.[54] And the trial judge instructed the jury that theft is obtaining unauthorized control over another's property with the intent to deprive the other of the property, that robbery requires the use of force in the course of a theft, and that a conviction for capital murder required proof of robbery – just as trial counsel had said.[55] There was, in short, nothing deficient in trial counsel's argument regarding intent to rob.

The petitioner identifies three ways in which trial counsel's treatment of intent to kill was deficient: (1) he failed to mention intent to kill in his opening

_____

[54] (Doc. 23-5 at 3-4).

[55] (Doc. 24-2 at 12-14).

statement and instead suggested that intent to rob was the one critical question on the capital murder charge; (2) he failed to walk the jury through the evidence discussed above regarding intent to kill; and (3) he failed to highlight the jury charges and explain the difference between capital murder and felony murder. (Doc. 13 at 33-34, 37-38, 41-43).

Trial counsel in his opening statement did emphasize lack of intent to rob at the legally relevant time. As discussed above, this defense was, or reasonably could be viewed as, the best of a bad lot. That alone would make trial counsel's opening statement constitutionally acceptable, but he did not wholly ignore intent to kill. Instead, he told the jury the petitioner was stoned and that he would present expert evidence of the consequences of crack addiction on a person's behavior,[56] thereby anticipating the testimony of Drs. Rosenzweig and DeFrancisco regarding intent to kill.

Trial counsel in his closing argument again devoted more attention to intent to rob than intent to kill. For reasons already discussed, the petitioner has failed to show that no competent counsel would have done as his counsel did.[57] Indeed, specifically addressing the items the petitioner identifies would have served chiefly to accentuate how weak the evidence was. Moreover, trial counsel did not ignore intent to kill but reminded the jury at least seven times that they could not convict his client of capital murder unless they found he intended to kill Ewing, and he emphasized that the petitioner's crack usage and the expert's testimony raised a reasonable doubt whether he had such an intent.[58]

---

[56] (Doc. 19-4 at 5-6).

[57] *See generally Ray v. Thomas*, 2013 WL 5423816 at *49 (S.D. Ala. 2013) (discussing counsels' "decision to orient their closing argument in favor of outright acquittal rather than conviction on a lesser-included charge" as "a classic example of a reasonable strategy decision that passes muster under *Strickland*").

[58] (Doc. 23-4 at 14, 18-24).

Given trial counsel's constitutionally reasonable decision to present lack of intent to rob as the petitioner's primary defense, it would have been perilous to encourage the jury to find the petitioner guilty of felony murder and to stress to the jury the definition of felony murder – which includes a killing in the course of or in furtherance of an intentional robbery.[59] Nor was there any deficiency or lack of clarity in the jury charges for which trial counsel needed to compensate. The trial judge repeatedly instructed the jury that it could not convict the petitioner of either murder or capital murder if it found that he did not intend to kill Ewing.[60] She continued by instructing the jury that, if it could not find an intent to kill, it could then consider the lesser-included offense of felony murder (which would of course be pointless if that offense also required an intent to kill), and she accurately listed the elements of this offense, which did not include intent to kill.[61]

The petitioner's criticism of trial counsel's closing argument is a challenge to its thoroughness and perfection. The "test for ineffectiveness is not whether counsel could have done more." *Putman v. Head*, 268 F.3d 1223, 1245 (11th Cir. 2001). "Counsel almost always can do more, but the Constitution requires only that counsel act reasonably"; "perfection is not required." *Id*. (internal quotes omitted). Because trial counsel's closing was professionally reasonable, his performance was not constitutionally deficient.

Even had trial counsel performed deficiently by raising any defense other than intent to kill, and even had he performed deficiently by failing to walk the jury through the evidence the petitioner believes supports the defense and through the definitions of capital murder and felony murder, the petitioner was not prejudiced thereby in any constitutionally meaningful sense. "When a defendant challenges a conviction, the question is whether there is a reasonable probability

---

[59] (Doc. 24-2 at 18).
[60] (*Id*. at 12, 13, 15, 16, 17).

[61] (*Id*. at 17-18).

that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695; *accord Jones v. Secretary, Florida Department of Corrections*, 834 F.3d 1299, 1312 (11th Cir. 2016). That is, there must be a reasonable probability that the jury would have acquitted the petitioner of the capital charge. *Id*. at 1321.[62] "[T]he question is not whether the defendant could have temporarily evaded conviction" by a mistrial. *Bates v. Secretary, Florida Department of Corrections*, 768 F.3d 1278, 1300 n.9 (11th Cir. 2014). "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision" and "must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like," including "the idiosyncrasies of the particular decisionmaker." *Strickland*, 466 U.S. at 695.

Given the massive weight of the evidence that the petitioner did intend to kill Ewing, given the weakness of the evidence he believes supports a contrary finding, and given the multiple ways in which his story of what occurred was contradicted by the physical evidence (thereby torpedoing his credibility), it is plain there is no reasonable probability that a properly functioning jury would have acquitted the petitioner of capital murder had his counsel put all his eggs in the no-intent-to-kill basket, walked the jury through the evidence on which the petitioner relies, and explained to the jury the difference between capital murder and felony murder.

To bolster his argument regarding prejudice, the petitioner has submitted affidavits from three jurors for the proposition that they did not believe he intended to kill Ewing. (Doc. 13 at 114, 117, 120). It is profoundly troubling, if it is true, that three jurors would vote to convict the petitioner of capital murder even

---

[62] The petitioner insists he need show only a reasonable probability that a single juror would have harbored a reasonable doubt as to his intent to kill. (Doc. 13 at 48). As discussed in text, that is an incorrect standard. The case on which the petitioner relies involved a jury's recommendation of life or death at the penalty phase, not its determination of guilt or innocence.

though they did not believe he intended to kill Ewing and even though they had been told approximately a dozen times, in closing argument and through the jury charge, that the jury could not convict the petitioner of capital murder unless it unanimously found beyond a reasonable doubt that he intended to kill Ewing.[63] This evidence, however, is neither properly before the Court nor discernibly probative of prejudice.

"[E]vidence about the actual process of decision, if not part of the record of the proceeding under review, … should not be considered in the prejudice determination." *Strickland*, 466 U.S. at 695. The affidavits all date from 2016 and plainly were not part of the record of the proceedings under review. Thus, they may not be considered by the Court. Even if considered, however, they do not raise a reasonable probability that the jury would have acquitted the petitioner of capital murder had trial counsel proceeded as the petitioner proposes. The affidavits do not suggest that any juror was confused or distracted by the other defenses raised by trial counsel, all the evidence the petitioner points to was before the jury (which was properly instructed on the law), and the presence of three jurors who did not believe the petitioner intended to kill Ewing would have ensured lively debate and thorough examination of the evidence regarding that intent.

Because the CCA resolved this claim on the merits as to both deficient performance and prejudice, its resolution is subject to the deferential standard of Section 2254(d). The petitioner does not assert that that the state court reached any unreasonable determination of the facts, but he does argue that its resolution of the claim represents an unreasonable application of *Strickland*. (Doc. 13 at 45-48). For the reasons set forth above, the Court does not agree that the CCA

---

[63] The affidavits were drafted and executed almost 20 years after the trial, and it is not unusual for memories to blur after such a long time. It is also possible to read the affidavits as saying only that the affiants did not believe the petitioner entered the store with the pre-formed intent to kill, not as denying his intent to kill at the time he stabbed and cut Ewing over 30 times.

unreasonably applied *Strickland*; on the contrary, the Court concurs with the state court's resolution of this claim.

In summary, the petitioner has failed to show either that counsel performed deficiently or that he was prejudiced by counsel's performance. He is thus not entitled to relief on this ground.

### B. Foregoing Heat-of-Passion Manslaughter.

Heat-of-passion manslaughter occurs when the defendant "causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself." Ala. Code § 13A-6-3(a)(2). Trial counsel did not submit a charge for heat-of-passion manslaughter but did submit a charge for reckless manslaughter under subsection (a)(1) of this section. At the charge conference, the trial judge sought clarity as to whether the petitioner sought a charge on heat of passion, and trial counsel assured her he did not, on the grounds that "[t]his is not heat of passion."[64] The petitioner argues that trial counsel provided ineffective assistance by not seeking such a charge and by not arguing the defense in closing argument. (Doc. 13 at 49-59).

"Alabama courts have … recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative." *Rogers v. State*, 819 So. 2d 643, 662 (Ala. Crim. App. 2001). Only the second of these legal provocations was potentially in play in the petitioner's case. The petitioner identifies his legal provocations as: (1) Ewing pushing and shoving him; (2) Ewing coming at him with a stick; (3) Ewing pulling

---

[64] (Doc. 23-2 at 113).

a plug of hair out of his head; (4) Ewing hitting him with his fists; and (5) Ewing and the petitioner engaging in a fight.  (Doc. 13 at 54, 91-94).[65]

On direct appeal, appellate counsel argued the trial judge erred by not instructing the jury on heat-of-passion manslaughter.  (Doc. 26-2 at 106-08).  Because trial counsel had not requested such a charge, the CCA reviewed the claim for plain error.  896 So. 2d at 640-41.  The CCA ruled that, as a matter of Alabama law, the petitioner could not base a heat-of-passion charge on Ewing's advancing on him with a stick because, given the undisputed physical evidence that the stick was found standing on end in a corner, "there was no reasonable or rational theory from the evidence to support" such a charge.  *Id*. at 641-42.  "We will not find plain error in a trial court's refusal to instruct a jury on a lesser-included offense where the only evidence tending to bring the crime within the definition of that lesser-included offense is a defendant's self-serving statement and where that statement is directly refuted by undisputed physical evidence."  *Id*. at 642.  The CCA noted that Ewing's wielding of a stick was "the only possible evidence that could have been used to argue heat-of-passion manslaughter."  *Id*. at 641.

On Rule 32 review, the CCA agreed with the trial court that trial counsel's performance in not requesting a heat-of-passion charge was not deficient; it did not address on the merits whether the petitioner was prejudiced by trial counsel's performance.  196 So. 3d at 310.  The CCA announced that "the only evidence tending to bring this crime within heat-of-passion manslaughter was [the petitioner's] own self-serving statement to police that Ewing attacked him with a stick, a statement that was refuted by undisputed physical evidence at the crime scene," and it concluded that, "[f]or the reasons explained in our opinion on direct

---

[65] In his reply brief, the petitioner incorporates into his argument regarding this claim his argument, addressed in Part VII of this opinion, that the trial court's failure to give a heat-of-passion instruction violated his due process rights.  (Doc. 55 at 17 & n.32 (incorporating Doc. 13 at 90-95)).

appeal, [the petitioner] was not entitled to a jury instruction on heat-of-passion manslaughter." *Id*. at 311.

The CCA noted that "[c]ounsel cannot be deficient for not requesting a jury instruction for which there is no evidence in support." 196 So. 3d at 311. This is but a particular application of the "axio[m] that the failure to raise nonmeritorious issues does not constitute ineffective assistance" of counsel. *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994).

The petitioner notes that "[a] person accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position." *McDowell v. State*, 740 So. 2d 465, 467 (Ala. Crim. App. 1998) (internal quotes omitted). However, first "[t]he defendant must present evidence of legal provocation to require a charge on heat of passion." *Id*. at 468 (internal quotes omitted). The petitioner insists that he presented such evidence but that the CCA "improperly chose to disbelieve" his statement that Ewing came at him with a stick. He also insists that a heat-of-passion charge was "supported by substantial evidence (other than the stick evidence)" that he and Ewing "engaged in a fight," which evidence the CCA "ignore[d]." (Doc. 13 at 93-94). The petitioner especially emphasizes his statement, corroborated by the physical evidence, that Ewing pulled a plug of hair from his head. (*Id*. at 54-56, 92-93). The petitioner characterizes the CCA's ruling as based on an unreasonable determination of the facts within the meaning of Section 2254(d)(2). (*Id*. at 90-91, 94). His argument misperceives both the CCA's ruling and a federal habeas court's function.

The CCA's ruling with respect to the stick was based on its application of the Alabama rule that, "in certain situations, an accused's self-serving statement may not be sufficient, by itself, to warrant an instruction on a lesser-included offense." 896 So. 2d at 641 (describing *Ex parte McWhorter*, 781 So. 2d 330 (Ala. 2000)). Its extension of that rule to the instant situation was not a determination of fact but a conclusion of law. To the extent its evaluation of the

evidence constituted a determination of the facts regarding the stick, that determination plainly was not unreasonable.  The petitioner has yet to offer the slightest explanation how the stick – if Ewing truly had brandished it and been stabbed and cut before he could use it – could have returned to its place of rest, standing upright in a corner far removed from the action and devoid of visible blood.  The CCA's ruling that the stick "was the only possible evidence that could have been used to argue heat-of-passion manslaughter," 896 So. 2d at 641, and "the only evidence tending to bring this crime within heat-of-passion manslaughter," 196 So. 3d at 311, was not a determination of the facts but of the legal significance of the petitioner's evidence.[66]

Both the CCA's rejection of the petitioner's stick evidence and its conclusion that no other evidence could support a heat-of-passion charge were rulings of state law, not federal law.  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  "Today we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions."  *Id*. at 67-68; *accord Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).

To summarize, Alabama law permits a charge on heat-of-passion manslaughter only if the petitioner presents evidence of legal provocation.  The CCA concluded that advancing on the petitioner with a stick would constitute legal provocation but that, as a matter of Alabama law, his statement that Ewing

---

[66] The CCA did not provide reasons for this conclusion, but it is not difficult to envision them.  "[The victim] shoving [the defendant] during an argument does not constitute legal provocation for heat-of-passion manslaughter."  *Living v. State*, 796 So. 2d 1121, 1130 (Ala. Crim. App. 2000).  All the later incidents the petitioner proposes as legal provocation occurred, by his own version of events, after he had begun stabbing and cutting Ewing.  (Doc. 49-2; Doc. 13 at 54).

did so had to be disregarded.[67] The CCA also concluded that the other alleged provocations do not constitute legal provocation under Alabama law. Thus, the CCA concluded that, as a matter of Alabama law, the petitioner could not properly receive a jury charge on heat-of-passion manslaughter. These rulings are not subject to review by this Court. Because trial counsel was not entitled to a charge on heat-of-passion manslaughter, he could not have performed deficiently by not requesting one.

Even if trial counsel had performed deficiently in this regard, the petitioner was not prejudiced by the failure to request a jury charge. "In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on the grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Strickland*, 466 U.S. at 694. "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id*. at 695. Thus, because the CCA has ruled that the petitioner was not entitled to a charge on heat-of-passion manslaughter, the Court must presume that the trial judge would have refused such a charge had it been requested. To the uncertain extent the petitioner suggests the trial judge was primed to give such a charge upon request, (Doc. 13 at 49 & n.183), "[t]he assessment of prejudice … should not depend on the idiosyncrasies of the particular decisionmaker …." *Strickland*, 466 U.S. at 695.[68]

The petitioner bases his prejudice argument on *Beck v. Alabama*, 447 U.S. 625 (1980). *Beck* held that a death sentence cannot constitutionally be imposed "when the jury was not permitted to consider a verdict of guilt of a lesser-included

---

[67] As noted in text, to the extent this ruling depended on a factual determination that Ewing did not advance on the petitioner with a stick, that determination easily survives scrutiny under Section 2254(d)(2).

[68] It appears to the Court that the trial judge was merely seeking clarification as to trial counsel's proposed charges, not inviting him to request a heat-of-passion charge. (Doc. 23-2 at 113).

non-capital offense, *and when the evidence would have supported such a verdict*." *Id*. at 627 (emphasis added). "*Beck* held that due process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis in original). The Alabama standard – that a lesser-included offense instruction should be given if there is any reasonable theory from the evidence which would support the position – "clearly does not offend federal constitutional standards." *Id*. at 611-12 (internal quotes omitted). Because the CCA applied this standard in ruling he was not entitled to a heat-of-passion charge, 196 So. 3d at 311 n.4, the petitioner was not prejudiced under *Beck*.

Although the petitioner suggests in passing that trial counsel was ineffective in "failing to argue [heat of passion] as a lesser-included offense,"[69] he could scarcely have performed deficiently by failing to argue a lesser-included offense as to which the jury was not charged and that was bad as a matter of law. Nor can he claim prejudice, since the jury must be presumed to follow the law and so could not have found the petitioner guilty of a non-capital offense that was not presented as an option in the jury charge.

In summary, the petitioner has failed to show either that counsel performed deficiently or that he was prejudiced by counsel's performance. He is thus not entitled to relief on this ground.

## II. Ineffective Assistance – Penalty Phase.

The petitioner presents this as a single claim. (Doc. 13 at 59-75). However, because prejudice must be measured separately with respect to the jury

---

[69] (Doc. 13 at 49; Doc. 55 at 18).

recommendation and the trial judge's sentence,[70] the Court evaluates the claim separately as to these component parts.

## A. Before Advisory Jury.

The Alabama Code lists ten aggravating circumstances. Ala. Code § 13A-5-49. The state has the burden of proving any aggravating circumstance beyond a reasonable doubt. *Id*. § 13A-5-45(e). An aggravating circumstance that was proved beyond a reasonable doubt at the guilt-innocence phase is deemed proved beyond a reasonable doubt for purposes of sentencing. *Id*.

The Code also lists seven mitigating circumstances. Ala. Code § 13A-5-51. "[M]itigating circumstances shall also include any aspect of a defendant's character or record and any of the circumstances of the offense … and any other relevant mitigating circumstance which the defendant offers …." *Id*. § 13A-5-52. "When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence." *Id*. § 13A-5-45(g).

The state relied on two aggravating circumstances: (1) that the killing occurred while the defendant was engaged in the commission of a robbery; and (2) that "[t]he capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." Ala. Code §§ 13A-5-49(4), (8). Trial counsel relied on three mitigating circumstances: (1) that the petitioner had "no significant history of prior criminal activity"; (2) that "[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"; and (3) that "[t]he capacity of the defendant to appreciate the criminality of his

---

[70] *See Brownlee v. Haley*, 306 F.3d 1043, 1075-80 (11th Cir. 2002) (because Alabama's sentencing scheme provides that the sentencing judge "shall consider" the jury's recommendation, Ala. Code § 13A-5-47(e), deficient performance by counsel that prejudices the defendant at the jury phase cannot be cured by the sentencing judge's decision).

conduct or to conform his conduct to the requirements of law was substantially impaired." *Id*. §§ 13A-5-51(1), (2), (6).

The petitioner identifies the following as reflecting deficient performance by his counsel regarding the aggravating circumstance that the murder "was especially heinous, atrocious, or cruel compared to other capital offenses":  (1) conceding in both opening and closing that this aggravating circumstance existed; (2) predicting that the trial judge would tell them that all murders are heinous, atrocious and cruel, even though very few actually are; (3) failing to review the jury charges that explained what the jury would be required to find in order to find this aggravating circumstance; and (4) failing to explain how the evidence undercut the state's contention that the murder was especially heinous, atrocious or cruel.  (Doc. 13 at 60-63, 72, 74).

The petitioner identifies the following as reflecting deficient performance regarding mitigating circumstances:  (1) not mentioning three non-statutory mitigating circumstances that were supported by the evidence; (2) in his opening statement, listing but not discussing the three statutory mitigating circumstances on which he relied; (3) failing to address any mitigating circumstances in closing argument; (4) failing to object to, or counter, the state's misstatement of the law regarding two statutory mitigating circumstances; and (5) failing to remind the jury that unrebutted mitigation evidence must be accepted.  (Doc. 13 at 61-62, 67-70, 72, 74).

Trial counsel did not concede that the aggravating circumstance of "especially heinous, atrocious, or cruel" was satisfied.  What he said in his opening statement was:

> She [the trial judge] will also instruct you that any homicide is heinous, atrocious and cruel.  In order to be satisfied that aggravating circumstance exists, there have to be special circumstances involving this homicide which distinguishes [sic] it from any other.[71]

---

[71] (Doc. 24-7 at 2).

Trial counsel thereby clearly cautioned the jury that it could not automatically find this aggravating circumstance to be satisfied. Moreover, trial counsel's statement parallels the Alabama pattern jury instruction stating that "all capital offenses are heinous, atrocious, and cruel to some extent,"[72] which instruction the trial judge gave the jury.[73] Trial counsel did not perform deficiently by making a correct statement of law.

The petitioner also argues that trial counsel conceded this aggravating circumstance in his closing argument. Again, he did not do so. What trial counsel said was, "The heinous, atrocious and cruel aspect which the Judge will instruct you about is another aggravating factor."[74] He did not thereby concede that this aggravating factor existed but only that it was a factor relied on by the state, with its existence *vel non* to be determined in compliance with the trial judge's instructions. Again, trial counsel did not perform deficiently by making a correct statement.

In his opening statement, trial counsel listed the three statutory mitigating circumstances proffered by the defense.[75] Although he did not discuss those circumstances, he promised the defense would put on evidence regarding them.[76] Trial counsel in fact presented two witnesses in mitigation, and their testimony (including cross-examination) runs approximately 100 pages.[77] The petitioner acknowledges that this evidence addressed the three statutory mitigating circumstances in some detail. Trial counsel did not perform deficiently by

---

[72] *Hall v. State*, 820 So. 2d 113, 146-47 (Ala. Crim. App. 1999).

[73] (Doc. 25-1 at 42; Doc. 25-5 at 7).

[74] (Doc. 25-3 at 3).

[75] (Doc. 24-6 at 2).

[76] (Doc. 24-7 at 2).

[77] (Doc. 24-8 at 3 to Doc. 25-1 at 21).

identifying the mitigating circumstances in his opening statement without telling the jury the evidence it would soon hear.[78]

In his closing argument, the prosecutor stated, "We don't doubt that he was under cocaine withdrawal, but that's not an excuse under the law. Judge Stuart will charge you what is required in this aspect."[79] The petitioner suggests that trial counsel should have objected to or otherwise clarified this statement, but a competent attorney could reasonably have believed that no objection was necessary or prudent. First, the argument was not improper, as the petitioner was in fact arguing that his cocaine withdrawal supported a finding of mitigating circumstances that could spare him from a death sentence, and "[f]ailing to make a meritless objection does not constitute deficient performance." *Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015). Second, even if the argument was improper, even obviously so, "[c]ounsel may decide, for strategic reasons, not to object to an obvious error," as when he "reasonably believes that correcting the error will actually cause greater harm to his client, perhaps by creating an unfavorable impression of counsel or the defendant in the eyes of the judge or jury." *Id*. Objecting to the prosecutor's argument would simply have drawn more attention it, and the likely overruling of the objection would have encouraged the jury to consider the petitioner's mitigating circumstances as mere excuses. Moreover, trial counsel was able to, and did, address the comment in his own closing, stating that the defense was not coming up with excuses to avoid accountability and that (as the prosecutor had also said) the trial judge would instruct the jury as to mitigating factors.[80]

---

[78] Trial counsel's opening statement concludes on page 1497 of the record. (Doc. 24-7 at 2). His presentation of evidence begins on page 1518. (Doc. 24-8 at 2).

[79] (Doc. 25-2 at 7).

[80] (Doc. 25-3 at 3-4).

The remainder of the petitioner's complaints address trial counsel's closing argument. "The right to effective assistance extends to closing arguments." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). "Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id*. at 6. "[W]hich issues to sharpen and how best to sharpen them are questions with many reasonable answers," and "[j]udicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas." *Id*.

After correctly conceding the existence of one aggravating circumstance (that the murder occurred in the course of a robbery), trial counsel mentioned the other alleged aggravating circumstance, reminded the jury of mitigating circumstances, and deferred to the trial judge's instructions as to them. He then told the jurors, correctly, that their recommendation would not depend on simply counting the number of circumstances on each side but on their "deliberate, conscious consideration of the significance and the weight of each of those factors that you find in the case."[81] Most of the balance of his argument: acknowledged the dreadful seriousness of the question; identified the only justification for death as vengeance and urged the jury not to engage in vengeance; rejected deterrence as a justification for a death sentence; declared that the legitimate interest in punishment and protecting society would be fully satisfied by a life sentence; and asked the jury to spare the petitioner's life.[82]

---

[81] (*Id*. at 3).

[82] (*Id*. at 3 to Doc. 25-4 at 2).

The petitioner characterizes trial counsel's approach as "counterproductive at best." (Doc. 13 at 63).[83]  The petitioner argues that, instead of this approach, trial counsel should have focused on weaknesses in the government's evidence of its aggravating circumstance and hammered home the evidence in mitigation. That would probably have been a reasonable approach to closing argument, but it is not the only one.

The petitioner in *Devier v. Zant*, 3 F.3d 1445 (11th Cir. 1993), argued "that his defense counsel was deficient in making a closing argument at the penalty phase that did not mention any of the mitigating evidence or address the crucial aggravating testimony of the prior rape allegedly committed by [the petitioner] and which consisted solely of a plea for mercy." *Id*. at 1454.  The closing, in short, mirrored that in this case.  The Eleventh Circuit rejected the petitioner's argument:  "The fact that defense counsel chose to place primary emphasis on eliciting sympathy from the jury for his client, rather than thoroughly dissecting the evidence presented in the penalty phase[,] is a uniquely tactical decision that a reviewing court must treat with deference.  In this case, we find nothing in the record to suggest that defense counsel's closing argument at the sentencing hearing was grossly deficient in presenting an adequate argument to the jury to impose a lesser punishment." *Id*.

---

[83] The petitioner bases this assertion on the fact the jury had been "death-qualified" pursuant to *Witherspoon v. Illinois*, 391 U.S. 510 (1968).  But the very purpose of *Witherspoon* was to "hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id*. at 522.  "A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State …." *Id*. at 520.  "The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Id*. at 522 n.21.  That a jury is "death-qualified" thus does not mean it is void of jurors with misgivings about the death penalty who could be swayed by a reasoned critique of the sanction.

There were ample justifications for trial counsel's approach.  The jury had convicted the petitioner of a gruesome murder, and attempting to argue expressly against the "especially heinous, atrocious, or cruel" aggravating circumstance could easily have alienated the jury, which had just been shown again some of the more gory photographs of Ewing and been walked through the long litany of insults to Ewing's body.[84]  Nor has the petitioner explained how his mitigation evidence "completely undercut the notion that this murder was particularly HAC." (Doc. 13 at 63; Doc. 55 at 23).[85]

The three non-statutory mitigating circumstances the petitioner identifies are:  (1) remorse; (2) cooperation; and (3) a family history of substance abuse. These were not the impressive circumstances the petitioner suggests.  While Dr. Rosenzweig testified at sentencing that she found the petitioner to be remorseful, her only basis for this impression was that he cried one time during their three-hour meeting when talking about the recurrent image of Ewing trying to get up and reaching for the door handle.[86]  The prosecutor countered by reminding the jury of the petitioner's flat, emotionless taped statement to the police a few hours after the slaying.[87]  The prosecutor continued by eliciting evidence from the petitioner's ex-wife that the petitioner cried every time she confronted him about his crack use and disposition of family assets, and he suggested the petitioner's

---

[84] (Doc. 24-7 at 13-21).

[85] The petitioner appears to believe that proof of a "diminished capacity" mitigating circumstance would "negate" this aggravating circumstance.  (Doc. 13 at 68). Assuming without deciding that the two are mutually exclusive, as discussed in text the petitioner's evidence of diminished capacity was so weak as to be practically non-existent.

[86] (Doc. 24-8 at 32, 33-34).

[87] (*Id*. at 65-67).  The petitioner denies he knew Ewing was dead when he gave his statement, (Doc. 13 at 69), but he certainly knew he had grievously injured Ewing.

tears were summoned for manipulation.[88] The petitioner's cooperation refers to his waiving of *Miranda*, giving a statement, and taking law enforcement to retrieve the bank bag and look for the knife. The jury's guilty verdict reflected a rejection of the petitioner's statement of what happened as a self-serving lie – which could hardly constitute cooperation in any meaningful sense – and offering that statement as mitigation could not have failed to offend the jury. The only history of substance abuse was that the petitioner's father had an "alcohol problem," along with a vague reference to "a string of substance abuse problems [including crack] that run on both sides of the family."[89]

As to criminal history, the petitioner was convicted in 1991 of unlawful possession of marijuana for other than personal use, which is a felony. He was then convicted in 1992 of possession of marijuana in the first degree, also a felony.[90] "Only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity,"[91] but convictions for nonviolent crimes can be considered.[92] For a defendant addicted to crack and claiming that

---

[88] (Doc. 25-1 at 14-15; Doc. 25-3 at 2). The petitioner insists his evidence that he was remorseful when Dr. Rosenzweig interviewed him is unrebutted, (Doc. 13 at 69-70), but the tension between his behavior on that occasion and at the time of his statement, and the evidence that he cried when convenient to him, obviously drew his remorse on the later occasion into question.

[89] (Doc. 24-8 at 23, 55). The petitioner also notes that his father sometimes beat his mother, apparently on account of alcohol, and that he sometimes witnessed it. (*Id.* at 23). But never after age eight or nine, when his parents divorced, after which he remained "particularly close" to his father and his new wife, with whom he lived as an adolescent. (*Id.* at 23-24).

[90] (Doc. 24-8 at 47-49; State's Exhibits B, C); *Clark v. State*, 896 So. 2d at 629 n.13.

[91] *Freeman v. State*, 651 So. 2d 576, 598 (Ala. Crim. App. 1994).

[92] *Williams v. State*, 601 So. 2d 1062, 1084 (Ala. Crim. App. 1991), *aff'd*, 662 So. 2d 929 (Ala. 1992).

crack played a defining role in the murder, two felony convictions for drug offenses do not make a compelling case of no significant criminal history.

As to the other statutory mitigating circumstances, the petitioner argues the experts presented unrebutted evidence that, at the time of the offense, he was in withdrawal from crack, which left him paranoid and with impaired judgment. (Doc. 13 at 64-66). The only way the expert testimony indicated the petitioner's judgment might be impaired was (consistent with paranoia) in misperceiving Ewing's approaching him with a stick as a mortal threat,[93] and the jury by its verdict had already clearly rejected that sequence of events.[94] Moreover, the police officer who stopped the petitioner within minutes of Ewing's slaying, and two other officers who soon joined him at Kenny's vehicle, all testified that the petitioner gave no indication of intoxication, responded appropriately to questions and commands, and behaved perfectly normally except for some nervousness of the kind that suspects and stopped civilians commonly display.[95]

In short, trial counsel was faced with horrific facts, no good answer to the state's aggravating circumstances, and only tepid mitigating evidence.[96] The

---

[93] (Doc. 23-2 at 89-90).

[94] When asked at the penalty phase if crack addition could cause a severe mental or emotional disturbance, Dr. Rosenzweig responded that it "can cause someone to become paranoid, and in some cases even aggressive." When asked if it would cause an inability to conform one's conduct to the law, she responded that it would not make anyone commit a crime or behave real aggressively but that it "certainly can predispose one in that direction." (Doc. 24-8 at 26-27, 28-29). This testimony is ignored by the petitioner, probably because it suggests only a possibility – but not a likelihood – that his extreme aggression against Ewing could be traced in part to his crack addiction.

[95] (Doc. 20-1 at 186-87; Doc. 21-1 at 83, 96-98, 101, 112).

[96] The petitioner repeatedly insists that his evidence as each mitigating circumstance was "unrebutted." (Doc. 13 at 60, 61, 67, 69, 70, 71, 72; Doc. 55 at 23). He apparently finds this point critical because Alabama law places the burden on the state to disprove any mitigating circumstance interjected by the petitioner. Ala. Code § 13A-5-45(g). As discussed in this section, however, there was evidence countering each of the petitioner's proposed mitigating circumstances except that of a family history of

jurors had just heard his mitigating evidence from Dr. Rosenzweig and the petitioner's ex-wife,[97] so they were unlikely to have forgotten it.[98]  Rather than focusing on those circumstances, potentially exposing their weakness and certainly inviting the prosecutor to do so in his rebuttal, trial counsel engaged the jury on a different, more philosophical level.  Especially in light of *Devier*'s upholding of a substantially similar approach, the petitioner has failed to show that no competent attorney would have selected the approach taken by his counsel.

Because trial counsel's performance before the jury in the penalty phase was professionally reasonable, it was not constitutionally deficient.[99]

"When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466 U.S. at 695.  In Florida and Alabama, where the trial court is required, respectively, to give "great weight" to or "consider" the jury's recommendation, the sentencer for this purpose

---

substance abuse; trial counsel could not correctly have argued that the jury was required by law to find that these mitigating circumstances existed.

[97] That evidence included, in addition to the matters discussed in text, information about the petitioner as a dutiful child, as a responsible adult before succumbing to drugs, and as a beloved son, father, grandfather and ex-husband.  The petitioner does not assert that trial counsel should have mentioned this material in his closing argument

[98] *See Doyle v. Dugger*, 922 F.2d 646, 652 (11th Cir. 1991) ("While Tenbrook's argument [at the penalty phase] was very brief and did not discuss the details of the doctors' testimony, Tenbrook may well have concluded that such details were unnecessary because the jury had heard that testimony immediately before the arguments.").

[99] The Rule 32 trial court ruled that trial counsel's performance was not deficient, and the CCA accepted this determination as "supported by the record."  196 So. 3d at 314-16.  The petitioner argues the CCA's ruling is entitled to no deference under Section 2254(d).  (Doc. 13 at 72-73).  The Court does not follow the petitioner's argument but, because it agrees that trial counsel's performance was not deficient, it need not address the argument.

is viewed as the jury. *Hardwick v. Crosby*, 320 F.3d 1127, 1190 (11th Cir. 2003); *Brownlee v. Haley*, 306 F.3d 1043, 1075-80 (11th Cir. 2002). Thus, a reasonable probability that non-deficient performance "could have changed the jury's recommended sentence from death to life imprisonment … constitutes actual prejudice." *Hardwick*, 320 F.3d at 1190.

Under Alabama law, a recommendation of death requires a vote of at least 10-2 in favor of that sanction, and a recommendation of life requires a vote of at least 7-5 in favor of that sanction. Ala. Code § 13A-5-46(g). If more than five but fewer than ten jurors vote for death, the jury cannot deliver a recommendation, and the trial court may declare a mistrial. *Id*. The petitioner's jury recommended death by a vote of 11-1.[100] In *Lawhorn v. Allen*, 519 F.3d 1272 (11th Cir. 2008), the Eleventh Circuit ruled that, where the Alabama jury recommended death by a vote of 11-1, counsel "needed only to convince two other jurors to alter the outcome of the proceedings" and that his deficient performance "prejudiced [the defendant] because there is a reasonable probability that, but for his unprofessional error, the result of the sentencing proceeding would have been different." *Id*. at 1297. In the absence of discussion by the parties, the Court therefore assumes without deciding that *Strickland* prejudice is demonstrated if there is a reasonable probability that, had trial counsel conducted the penalty phase as the petitioner suggests, at least two additional jurors would have voted for life rather than death.[101]

The petitioner says that this reasonable probability exists because there were three jurors that did not believe he intended to kill Ewing, two of whom

---

[100] (Doc. 25-7 at 2).

[101] The petitioner argues that *Strickland* prejudice is demonstrated by a reasonable probability that a single juror would have changed his or her vote. (Doc. 13 at 67-68). The Court in *Bertolotti v. Dugger*, 883 F.2d 1053 (11th Cir. 1989), did state that, "if there is a reasonable probability that one juror would change his or her vote, there is a reasonable probability that a jury would change its recommendation." *Id*. at 1519 n.12. This statement appears to be dicta, since the Court ruled there was no reasonable probability that the omitted evidence would have resulted in a life sentence. *Id*. at 1519.

nevertheless voted in favor of death. (Doc. 13 at 68, 114, 117, 120). As the Court noted in Part I.A, "[e]vidence about the actual process of decision, if not part of the record of the proceeding under review, … should not be considered in the prejudice determination." *Strickland*, 466 U.S. at 695. The petitioner therefore cannot rely on the affidavits to demonstrate prejudice.

In light of the brutal nature of the crime, the dubious character of the mitigating evidence, and its primary dependence on the drug use and consequences thereof that had been unsuccessfully presented at the guilt-innocence phase (albeit for a different purpose), and given that the jurors heard all the mitigating evidence shortly before they deliberated and knew they could consider anything to be a mitigating circumstance, it is difficult to imagine that multiple jurors would have changed their vote to life had trial counsel adopted the petitioner's proposed approach. Ultimately, however, the Court need not resolve the prejudice issue directly. The CCA, approving the trial court's decision, ruled that the petitioner was not prejudiced by counsel's performance. 196 So. 3d at 314-16. While the petitioner challenges the CCA's ruling with respect to deficient performance, (Doc. 13 at 72-73), he does not challenge its ruling with respect to prejudice. Thus, pursuant to Section 2254(d), the Court may not revisit the CCA's determination.

In summary, the petitioner has failed to show either that counsel performed deficiently or that he was prejudiced by counsel's performance. He is thus not entitled to relief on this ground.

## B. Before Trial Judge.

The petitioner raises a similar, but shorter, argument regarding trial counsel's presentation to the trial judge before sentencing. He faults counsel for failing to explain to the trial judge how his mitigation evidence was "unrefuted" and how it "definitively established" various mitigating circumstances. (Doc. 13 at 60). He complains that counsel's brief argument prior to sentencing was

52

ineffectual. (*Id*. at 71). And he asserts he was prejudiced by this performance in that the trial judge would have found diminished capacity as a mitigating circumstance and would not have found "especially heinous, atrocious, or cruel" as an aggravating circumstance. (*Id*. at 72).

 Before the trial judge imposed sentence, trial counsel reminded the Court of Dr. Rosenzweig's testimony, which he described as uncontradicted and unrefuted and which he said established as a mitigating factor that the petitioner's ability to appreciate the criminality of his conduct was substantially impaired and/or that he was unable to control his conduct. He also argued that the petitioner's previous drug convictions did not negate the mitigating factor of no significant criminal history. Counsel stressed that the events of February 14, 1998 were an aberration, not characteristic of the petitioner but a result of crack addiction. He concluded with a plea for a sentence of life imprisonment. (Doc. 25-8 at 12-13).

The petitioner criticizes trial counsel for: (1) failing to explain to the trial judge that unrebutted mitigation evidence has to be accepted; (2) failing to explain to the trial judge that diminished capacity for purposes of the two statutory mitigating circumstances is different than insanity or lack of intent to kill; (3) failing to explain to the trial judge "the level of wickedness necessary" to establish the aggravating factor of "especially heinous, atrocious, or cruel"; and (4) failing to counter the prosecutor's suggestion that the standard for diminished capacity was the same as for insanity, *viz*., inability to determine right from wrong. (Doc. 13 at 71-72).

The trial judge's instructions to the jury included each of the items listed in the preceding paragraph.[102] What the petitioner suggests is that, even though the trial judge was a learned jurist, and even though she had recently prepared and delivered jury charges making precisely the petitioner's points, every competent attorney would have believed she was oblivious to them and had to be reminded of

---

[102] (Doc. 25-5 at 7, 10, 11).

them.  The petitioner offers no authority for the proposition that counsel performs deficiently when he assumes a judge is cognizant of legal principles she has herself articulated.  Trial counsel was not deficient in failing to make the statements identified in the preceding paragraph.

Nor was counsel deficient in failing to explain to the trial judge how his mitigation evidence was unrefuted and how it conclusively established his mitigating circumstances.  As discussed in Part II.A and note 95, *supra*, the only mitigating circumstance relied on by the petitioner that could be said to be unrefuted was that of a family history of substance abuse.  Counsel could not perform deficiently by declining to falsely assert that the mitigating evidence was unrefuted and the mitigating circumstances thus established as a matter of law.[103]

Finally, the petitioner faults his counsel for failing to tell the trial judge that one juror voted against a death sentence.  (Doc. 13 at 74).  The trial judge had received and read the jury's recommendation, including the vote,[104] and she could not possibly have been unaware of the dissenting vote.  Trial counsel was not deficient in not telling the trial judge what she already knew.

As noted, to demonstrate prejudice the petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not

---

[103] As noted in Part II.A and note 93, *supra*, the petitioner does not rely on Dr. Rosenzweig's testimony that the petitioner's crack withdrawal could predispose him to extreme aggression even if he was not attacked by Ewing.  Assuming without deciding that such a possibility was not refuted, no factfinder could be compelled to find, from the mere possibility that the murder of Ewing was prompted by crack withdrawal, that the murder was in fact so prompted.  This is especially so given that the presentence report (which the trial judge reviewed before imposing sentence) contained the statement of the petitioner's own character reference that, even in the years he was not using crack, he had a "short fuse" and exhibited "stormy and tumultuous" behavior with family members. (Doc. 15-6 at 6, 8).  It is also especially so given that the petitioner threatened to kill another inmate, which is a rare occurrence even at the crowded Baldwin County jail. (Doc. 25-1 at 29-31).

[104] (Doc. 25-7 at 2).

warrant death." *Strickland*, 466 U.S. at 695. As noted, the petitioner argues that, but for trial counsel's alleged errors, the trial judge would have found diminished capacity as a mitigating circumstance and would not have found the "especially heinous, atrocious, or cruel" aggravating circumstance. (Doc. 13 at 72). The Court assumes without deciding that, under such a scenario, there is a reasonable probability the trial judge would have found that the balance of aggravating and mitigating circumstances favored life over death. The petitioner, however, has not shown a reasonable probability that the trial judge would have found the identified mitigating circumstance and not found the identified aggravating circumstance.

The trial judge utilized the correct legal standard in finding the murder to be especially heinous, atrocious or cruel,[105] so counsel's failure to remind her of that standard could not have affected her decision. The trial judge understood that diminished capacity does not require an inability to determine right from wrong,[106] so counsel's failure to remind the trial judge of that principle could not have affected her decision. And trial counsel did tell the trial judge that his evidence concerning diminished capacity was uncontroverted,[107] so his (non-existent) failure to do so could not have affected her decision.

The CCA rejected the petitioner's claim on the merits of both the deficient performance and prejudice prongs. 196 So. 3d at 314-16. As noted, the petitioner challenges the CCA's decision as to the first prong but not the second. (Doc. 13 at 72-73). Pursuant to Section 2254(d), the Court thus may not revisit the latter ruling, and it agrees with the former.

In summary, the petitioner has failed to show either that counsel performed deficiently or that he was prejudiced by counsel's performance. He is thus not entitled to relief on this ground.

---

[105] (Doc. 15-2 at 9; Doc. 15-5 at 3-4).

[106] (Doc. 25-5 at 10).

[107] (Doc. 25-8 at 12).

### III.  Physical Restraint – Due Process Violation.

"[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 624 (2007) (internal quotes omitted).  The same rule applies to the penalty phase of capital prosecutions.  *Id.* at 624, 633. "[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate prejudice to make out a due process violation."  *Id*. at 635.  Instead, "[t]he State must prove beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained."  *Id*. (internal quotes omitted).

The petitioner, relying on juror affidavits obtained in 2016, argues that at least some jurors saw him in leg braces or shackles.  Because the trial judge permitted this arrangement without making any case-specific determination of its necessity, and because prejudice is presumed, the petitioner concludes he has established a constitutional violation.  (Doc. 13 at 75-78).  The respondent argues that this claim is unexhausted and procedurally barred because it was not presented to any state court.  (Doc. 52 at 67-68).  The petitioner replies that his Rule 32 counsel initially asserted this claim in the trial court but later verbally withdrew it at the commencement of the Rule 32 hearing.  (Doc. 55 at 32-33).[108] The petitioner concludes that the procedural default, which he does not dispute, is excused under the rule of *Martinez v. Ryan*, 566 U.S. 1 (2012).  (Doc. 55 at 32).

"[W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim … where appointed counsel in the

---

[108] (Doc. 38-2 at 55, 62; Doc. 44-2 at 4).  Although the Rule 32 record does not disclose why collateral counsel withdrew this claim, the petitioner asserts it was because collateral counsel did not interview the jurors and so had no evidence that any juror saw his leg braces.  (Doc. 13 at 33).

initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* ….” *Martinez*, 566 U.S. at 14. “To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.” *Id*. The Supreme Court subsequently extended *Martinez* to “where [the] state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal.” *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013).

On its face, the rule announced in *Martinez* and *Trevino* excuses procedural default only of ineffective assistance claims. “By its own emphatic terms, the Supreme Court's decision in *Martinez* is limited to claims of ineffective assistance of trial counsel that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel.” *Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013). “We have emphasized that the equitable rule established in *Martinez* applies only to excusing a procedural default of ineffective-trial-counsel claims and, for that reason, has no application to other matters ….” *Chavez v. Secretary, Florida Department of Corrections*, 742 F.3d 940, 945 (11th Cir. 2014) (internal quotes omitted).

The Supreme Court itself has recently closed the door the petitioner seeks to force open. “That exception [of *Martinez* and *Trevino*] treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim – ineffective assistance of trial counsel ….” *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). “On its face, *Martinez* provides no support for extending its narrow exception to new categories of procedurally defaulted claims.” *Id*. at 2065. Moreover, the *Martinez* Court “was responding to an equitable consideration that is unique to claims of ineffective assistance of trial counsel ….” *Id*. at 2068. That concern was that states can effectively force

ineffective assistance claims to be first raised in the collateral context, where effective counsel is not required by the Constitution. *Id.* Here, in contrast, the state did not prevent or even discourage the petitioner from raising on direct appeal his constitutional challenge to wearing a leg brace.

Because this claim is procedurally defaulted and the petitioner is unable to show cause for the default, he is not entitled to relief on this ground.

## IV.  Physical Restraint – Ineffective Assistance.

The petitioner argues that trial counsel was ineffective for failing to object to the use of physical restraints at trial and for failing to develop the record regarding same.  (Doc. 13 at 78-79).  The respondent argues that this claim is unexhausted and procedurally barred because it was not presented to any state court.  (Doc. 52 at 67-68).[109]  The petitioner again invokes *Martinez* to excuse this admitted procedural default.  (Doc. 55 at 35-36).

The rule of *Martinez* excuses the procedural default of an ineffective-assistance-of-trial counsel claim when the cause for the default is the ineffective assistance of collateral counsel in an "initial-review" collateral proceeding.  566 U.S. at 14.  Initial-review collateral proceedings are those "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* at  8.  "The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings …." *Id.* at 16.  "It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial …."  *Id.*; *accord Lambrix v. Secretary, Florida Department of Corrections*, 756 F.3d 1246, 1260 (11th Cir. 2014); *Arthur v. Thomas*, 739 F.3d 611, 629 (11th Cir. 2014).

---

[109] As with the previous issue, this issue was initially presented by collateral counsel in brief but withdrawn at the commencement of the Rule 32 hearing.  (Doc. 38-2 at 71; Doc. 44-2 at 4).

In *Coleman v. Thompson*, 501 U.S. 722 (1991), the defendant argued that "it was the ineffectiveness of his counsel during the appeal from [the state habeas trial court] determination that constitutes cause to excuse his default." *Id*. at 755. The Supreme Court held that a defendant has no constitutional right to counsel to appeal a state collateral determination. *Id*. at 755-57. "Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error [by appellate counsel] that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas." *Id*. at 757. After *Martinez*, "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here," *viz*., ineffective assistance of initial-review collateral counsel. 566 U.S. at 16.

The petitioner acknowledges he did not raise this claim of ineffective assistance of counsel before the CCA on appeal from the Rule 32 trial court's ruling or on petition for writ of certiorari to the Alabama Supreme Court. (Doc. 55 at 35). While *Martinez* and *Trevino* might assist the petitioner in avoiding the procedural default arising at the Rule 32 trial level, they cannot excuse his procedural default at the Rule 32 appellate level.

Because this claim is procedurally defaulted and the petitioner is unable to show cause for the default, he is not entitled to relief on this ground.

## V. Failure to Consider or Find Mitigating Circumstances.

"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer … not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1973) (plurality opinion) (emphasis omitted). "In *Eddings* [*v. Oklahoma*, 455 U.S. 104 (1982)], the view adopted by the *Lockett* plurality ripened into a holding of the Court." *Saffle v. Parks*, 494 U.S. 484, 489 (1990). The "precise holding" of *Lockett* and *Eddings* is "that the State cannot bar

relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial." *Id*. at 490. Nor "may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." *Eddings*, 455 U.S. at 114 (emphasis in original). "The sentencer [and an appellate court] may determine the weight to be given relevant mitigating evidence[,] [b]ut they may not give it no weight by excluding such evidence from their consideration." *Id*. at 114-15. Thus, for example, "[w]e think it could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances, and that the proceedings therefore did not comport with the requirements of" *Eddings* and *Lockett*. *Hitchcock v. Dugger*, 481 U.S. 393, 398 (1987). While this line of cases requires a sentencer to *consider* mitigating evidence, it does not require the sentencer to *accept* the evidence as accurate or as mitigating, to *find* the existence of a mitigating circumstance, or to *assign* a mitigating circumstance a particular weight or any weight at all. *E.g., Morris v. Secretary, Department of Corrections*, 677 F.3d 1117, 1131 (11th Cir. 2012); *Schwab*, 451 F.3d at 1329.

The trial judge in her sentencing order discussed each of the seven statutory mitigating factors and found that none existed. The trial judge then acknowledged her obligation to consider any non-statutory mitigating circumstance offered by the petitioner. After discussing the petitioner's history of substance abuse, the trial judge found, "based upon the evidence presented in all three phases of this trial, as well as that evidence presented in the presentence investigation, that there is no mitigating circumstance in this case." The trial judge concluded, "upon weighing of the aggravating circumstances against the nonexisting mitigating circumstances," that the aggravating circumstances outweighed the mitigating circumstances.[110] The petitioner argues that the trial judge did not in fact consider his evidence of mitigating circumstances because, had she done so, she would

---

[110] (Doc. 15-5 at 4-8).

have been required by Alabama law and the state of the evidence to find that several of them existed.  (Doc. 13 at 77-89).

The CCA found as a fact that the trial judge "considered all of the mitigating evidence offered by" the petitioner.  896 So. 2d at 652; *accord id*. at 653 ("[I]t is clear from a review of the entire record that the trial court understood its duty to consider all the mitigating evidence presented by [the petitioner and] that the trial court did in fact consider all such evidence ….").  The petitioner challenges this finding as unreasonable under Section 2254(d)(2).  (Doc. 13 at 87, 88).  He also argues that the state court ruling constitutes an unreasonable application of *Hitchcock* and its predecessors.  (*Id*. at 88-89).[111]

As noted in Part II.A, "[w]hen the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."  Ala. Code § 13A-5-45(g).  The petitioner says that he presented unrebutted evidence regarding the mitigating circumstances of:  (1) diminished capacity;[112] (2) remorse; (3) an abusive childhood; and (4) cooperation.  (Doc. 13 at 81, 86-87).  He concludes that the trial judge's failure to find these mitigating circumstances despite Section 13A-5-45(g) "demonstrates that [she] failed to consider, to any degree, the unrebutted mitigation that [he] established."  (*Id*. at 83-84).

---

[111] The petitioner also invokes Section 2254(d)(8), (Doc. 13 at 84), but that provision no longer exists.

[112] By "diminished capacity," the petitioner denotes the statutory mitigating circumstance of "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Ala. Code § 13A-5-51(6).  (Doc. 13 at 71-72); *Clark*, 196 So. 3d at 319.  This is consistent with common usage of the term. *E.g., Dotch v. State*, 67 So. 3d 936, 999 (Ala. Crim. App. 2010); *Washington v. State*, 106 So. 3d 423, 440 (Ala. Crim. App. 2007), *rev'd on other grounds*, 106 So. 3d 441 (Ala. 2011); *Smith v. State*, 756 So. 2d 892, 911 (Ala. Crim. App. 1997), *aff'd*, 756 So. 2d 957 (Ala. 2000).

As noted above, the trial judge made explicitly clear that she knew her obligation to consider anything offered by the petitioner as mitigating evidence. She also stated that, after reviewing all the evidence (along with the presentence report), she found no mitigating circumstance. Finally, she stated that she weighed the aggravating circumstances against the (nonexistent) mitigating circumstances. The Eleventh Circuit has repeatedly ruled that such circumstances reflect that the trial judge did in fact fulfill his or her constitutional obligation to consider the defendant's proffered evidence of mitigating circumstances. *See, e.g., Baldwin v. Johnson*, 152 F.3d 1304, 1324 (11th Cir. 1998) ("Although the court did not discuss any nonstatutory mitigating evidence …, the court preceded [its] findings through stating that it had 'considered the evidence presented at trial and at said sentence hearing.'") (emphasis omitted); *Card v. Dugger*, 911 F.2d 1494, 1523 (11th Cir. 1990) (comments by the trial judge, as well as his jury charge, reflected that he knew non-statutory mitigating circumstances could be considered, and even though his order did not specifically address non-statutory mitigating circumstances, it did state that he had considered and weighed all evidence in the case); *Funchess v. Wainwright*, 772 F.2d 683, 693 (11th Cir. 1985) ("This court has on previous occasions held that the fact that the sentencing order does not refer to the specific types of non-statutory mitigating evidence petitioner introduced indicates only the trial court's finding the evidence was not mitigating, not that such evidence was not considered.") (internal quotes omitted); *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984) (even though the trial judge read a prepared sentence of death (addressing only statutory mitigating circumstances) immediately upon the conclusion of the sentencing hearing (at which hearing the defendant presented evidence of non-statutory mitigating circumstances), the Eleventh Circuit could not conclude that the trial judge had not considered the evidence presented at the hearing, since he "patiently heard all of the evidence [the defendant] had to offer").

The Supreme Court has ruled similarly. *See Parker v. Dugger*, 498 U.S. 308, 314 (1991) (where the trial judge overrode a jury recommendation of life, "[w]e must assume that the trial judge considered all this [non-statutory mitigating] evidence before passing sentence. For one thing, he said he did"; because the trial judge was legally required to consider any mitigating evidence, because he instructed the jury it could consider non-statutory mitigating evidence, and because the defendant's mitigating evidence was of a type the Florida Supreme Court had found adequate to preclude a jury override, "[t]he trial judge must have at least taken this evidence into account before passing sentence.").

These cases alone reflect the weakness of the petitioner's position, but it gets worse. In *Clark v. Attorney General*, 821 F.3d 1270 (11th Cir. 2016), the defendant emphasized, as proof the trial judge had not considered his mitigating evidence, that the sentencing document did not reference the defendant's psychiatric reports despite Florida law requiring that "'the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature.'" *Id*. at 1286 (quoting *Campbell v. State*, 571 So. 2d 415, 419 (Fla. 1990), *receded from in part on other grounds, Trease v. State*, 768 So. 2d 1050 (Fla. 2000)). The Eleventh Circuit rejected the defendant's challenge by: noting that a violation of state law will not support habeas relief; reaffirming that "the failure to reference non-statutory mitigating circumstances in a sentencing [order] is an insufficient basis to entitle a federal habeas petitioner to relief"; and deeming reasonable the Florida Supreme Court's finding that the trial judge considered the mitigating evidence, since the trial judge said he had considered all relevant information and since his finding that no mitigating factors outweighed the statutory aggravating circumstances "is better understood as a conclusion that follows appropriate consideration rather than as evidence that no consideration was undertaken at all." *Id*. at 1287.

In light of these cases as applied to the undisputed record of the proceedings, it is clear that the trial judge in fact considered all of the petitioner's proposed mitigating evidence. As in *Parker*, *Clark*, *Baldwin* and *Card*, the trial judge expressly stated that she had reviewed all the evidence in reaching her decision regarding mitigating circumstances. As in *Parker* and *Card*, she gave jury charges requiring consideration of all evidence offered in mitigation. As in *Card*, she expressly acknowledged her obligation to consider such evidence. As in *Palmes*, she listened to all the proffered mitigating evidence. And as in *Carter*, she stated that she weighed the mitigating circumstances against the aggravating circumstances. As in all six cited cases, that the trial judge did not expressly address the proposed mitigating circumstances or the evidence regarding them is inconsequential.

The petitioner's argument regarding "unrebutted" mitigation evidence cannot alter the Court's finding that the trial judge considered all offered mitigating evidence. *Clark* makes clear that, at least when (as here) the usual indicia of actual consideration are present, the trial judge's failure to comply with a legal requirement that would of itself demonstrate actual consideration does not indicate the absence of consideration. Even if *Clark* did not confirm the Court's factual finding, it certainly defeats the petitioner's argument that the CCA's identical finding is unreasonable,[113] which leaves that finding intact.[114]

---

[113] The CCA relied for its finding on: the trial judge's failure to limit or restrict the petitioner in presenting evidence or argument regarding mitigating circumstances; her express discussion of each statutory mitigating circumstance; and her statement that she had considered each possible mitigating circumstance. 896 So. 2d at 651-53.

[114] The petitioner posits that the CCA's resolution contravenes or unreasonably applies *Lockett* and its progeny because those cases do not permit a trial judge to satisfy the Eighth and Fourteenth Amendments simply by saying she has considered all mitigating evidence. (Doc. 13 at 84, 88; Doc. 55 at 37). The petitioner is correct that these cases require actual consideration of the mitigating evidence, but they do not address how that fact is to be determined. However, the Eleventh Circuit cases cited in text (and many others) do establish such a framework, and it places great importance on the trial judge's express confirmation that she has considered the mitigating evidence. As

Moreover, the petitioner's argument is flawed on its own terms. He does not define the term "unrebutted." In order to sustain his argument, however, it must mean, at least, that the evidence of a particular mitigating circumstance was sufficiently strong that the trial judge could not properly have failed to find the mitigating circumstance; otherwise, the trial judge's failure to find the mitigating circumstance would be consistent with her rejection of the mitigating circumstance after considering the relevant evidence. Because the state bears the burden of disproving a mitigating circumstance, the petitioner must show both that the evidence in favor of a mitigating circumstance was almost as strong as the evidence against it (since the state's burden is only a preponderance of the evidence) after accounting for credibility and other matters affecting the weight of evidence, and that no reasonable factfinder could believe otherwise. The petitioner's mitigating evidence was not unrebutted under this demanding standard.

As to diminished capacity, the petitioner concedes that the only thing unrebutted was that, at the time he killed Ewing, he was under the influence of crack or experiencing crack withdrawal. (Doc. 13 at 83). That condition, however, does not of itself compel a finding that the petitioner's ability to appreciate that his conduct was criminal, or to keep himself from killing Ewing, was substantially impaired. *E.g., Williams v. State*, 710 So. 2d 1276, 1346-47 (Ala. Crim. App. 1996), *aff'd*, 710 So. 2d 1350 (Ala. 1997).[115] More

_____

noted, the Supreme Court in *Parker* relied on the very same proof. Even if there were doubt whether the Supreme Court would approve the Eleventh Circuit standard, that standard demonstrates that the CCA's ruling does not contravene or unreasonably apply *Lockett* and its progeny.

[115] As discussed in notes 93 and 102, *supra*, the petitioner does not rely on Dr. Rosenzweig's testimony that crack addiction can sometimes predispose a person to aggression. At any rate, and as noted therein, a mere possibility that the petitioner's condition could prompt aggression could not compel every reasonable factfinder to find that the petitioner was substantially impaired in appreciating the criminality of his

fundamentally, the trial judge explicitly discussed this mitigating circumstance in her sentencing order,[116] rendering it impossible that she did not consider it.

As to remorse, and as discussed in Part II.A, Dr. Rosenzweig's opinion that the petitioner felt remorse because he cried one time during their three-hour interview was countered by evidence that his tears are manipulative and that the unemotional tone of his recorded statement reveals no trace of remorse. Moreover, the trial judge also reviewed the presentence report, which reflects that the petitioner continued to downplay his responsibility without expressing any remorse for Ewing's death.[117] While the defendant at allocution told the trial judge "how very sorry I am,"[118] she was not obligated to accept this brief statement as true remorse. Certainly a reviewing court, which did not hear these spoken words or the tone in which they were delivered, and which did not sit through several days of trial and observe the petitioner's demeanor, cannot require the trial judge to take his allocution at face value. The petitioner's evidence of remorse, in short, was undermined on several fronts, was far from "unrebutted," and was not so strong that no reasonable factfinder could have failed to find this mitigating circumstance.

As to cooperation, and as discussed in Part II.A, the petitioner's alleged "cooperation" consisted of giving a recorded statement in which he offered an exculpatory version of his encounter with Ewing that the jury by its verdict necessarily found to be false. The petitioner does not make the fatuous suggestion that giving the police a false statement is a mitigating circumstance; nor does he suggest that the trial judge was required to accept as true a statement the jury

---

conduct or in conforming his conduct to the law – especially given the ample evidence of the petitioner's hot temper and threats of extreme violence even when not using crack.

[116] (Doc. 15-2 at 11; Doc. 15-5 at 6).

[117] (Doc. 15-6 at 4).

[118] (Doc. 25-8 at 15).

believed to be false. There was, in short, no plausible basis for finding cooperation as a mitigating circumstance.

That leaves for discussion the petitioner's "abusive childhood." (Doc. 13 at 81). As the petitioner acknowledges, this evidence consisted of the petitioner, "as a child, witnessing his father physically abuse his mother." (*Id*. at 87). Dr. Rosenzweig testified that the petitioner's father told her that, due to his alcohol problem, he began to beat his wife and that the petitioner witnessed some of those occasions, though not after his parents divorced when he was eight or nine.[119] The petitioner, however, described his childhood as normal and his relationship with his parents as good.[120] While there was uncontradicted evidence that the petitioner saw his father beat his mother, "whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority." *Stanley v. State*, 143 So. 3d 230, 330 (Ala. Crim. App. 2011) (internal quotes omitted). The trial judge certainly had discretion on this record to find that the petitioner seeing his father beat his mother over 30 years earlier was not mitigating, especially when the petitioner himself thought his childhood normal and his parental relationships good. *See id*. at 331 ("The trial court is not obliged to afford any weight to the defendant's history as a mitigating factor in that the defendant never established why his past victimization led to his current behavior.") (emphasis and internal quotes omitted); *id*. (that others in similar situations do not commit capital murder is a reason not to find a difficult childhood to be a mitigating circumstance); *see also Albarran v. State*, 96 So. 3d 131, 160 (Ala. Crim. App. 2011) ("[W]hen a defendant is several decades removed from the abuse being offered as mitigating evidence its value is minimal.") (internal quotes omitted).

In short, even if *Clark* leaves open the possibility of showing that a trial judge did not consider mitigating evidence based on her failure to find a mitigating

---

[119] (Doc. 24-8 at 23).

[120] (Doc. 15-6 at 6, 28, 35; Doc. 24-8 at 23-24).

circumstance, the petitioner's mitigating evidence was so bland and/or so undermined by other evidence that the trial judge's failure to find any mitigating circumstances cannot support a reasonable inference that she did not consider his mitigating evidence.

In order to obtain a new sentencing hearing based on a failure to consider mitigating evidence, the plaintiff must show the constitutional error was not harmless, that is, that it "'had substantial and injurious effect or influence in determining' the sentence." *Schwab v. Crosby*, 451 F.3d 1308, 1330 (11th Cir. 2006) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)); *accord Baldwin*, 152 F.3d at 1324 n.22. This is an "actual prejudice" standard. *Brecht*, 507 U.S. at 637. "For the error not to have been harmless, there must be more than a reasonable possibility that the error contributed to the sentence." *Ferguson v. Secretary, Department of Corrections*, 580 F.3d 1183, 1200 (11th Cir. 2009). The petitioner does not acknowledge or address his burden regarding prejudice. Because it is plain that the petitioner's constitutional rights were not violated, neither does the Court address this element of his claim.

In addition to asserting the trial judge's failure to find any mitigating circumstances as proof she violated her constitutional duty to consider his mitigating evidence, the petitioner claims that the trial judge committed constitutional error by her failure to find any mitigating circumstance. For this argument he relies on *Magwood v. Smith*, 791 F.2d 1438 (11th Cir. 1986). (Doc. 13 at 85-87).

In *Magwood*, four experts determined that the defendant suffered from a serious mental disorder at the time of the killing, and none found him free of mental disease at that time. 791 F.2d at 1450. The trial judge nevertheless rejected the statutory mitigating circumstances of extreme mental or emotional disturbance and of substantial impairment of the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law. *Id*. at 1447. The *Magwood* panel noted that, to survive constitutional scrutiny, a capital

sentencing scheme must provide sufficient safeguards against arbitrary and capricious imposition of the death penalty. *Id*. at 1449. The Court ruled that, because the trial judge's rejection of the statutory mitigating circumstances was not fairly supported by the record (the Section 2254(d) standard at the time for reviewing state court factual determinations), the petitioner was sentenced to death without constitutionally minimal safeguards. *Id*.

*Magwood* is in seeming tension with other Eleventh Circuit cases standing for the proposition that "[a]cceptance of nonstatutory mitigating factors is not constitutionally required …." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992). Assuming without deciding that *Magwood* accurately reflects Eleventh Circuit law, the discussion above demonstrates that the trial judge's failure to find the mitigating circumstances asserted by the petitioner in his argument is not only fairly supported by the record but resoundingly so.

Finally, the petitioner argues the trial judge "abused [her] discretion" by failing to find the mitigating circumstances identified above. (Doc. 13 at 79, 84, 85, 88). For this proposition, the petitioner relies on *Reynolds v. State*, 114 So. 3d 61 (Ala. Crim. App. 2010), one of many decisions identifying the standard of review of a trial judge's failure to find a mitigating circumstance as abuse of discretion. *Id*. at 154. A federal habeas court does not sit in judgment of a state court regarding its compliance with state law, the violation of which cannot form the basis of habeas relief; the petitioner's argument is thus inapposite. At any rate, the foregoing discussion of the evidence demonstrates clearly that the trial judge did not abuse her discretion.

In summary, the trial judge did not unconstitutionally fail to consider or find any mitigating circumstance. Accordingly, the petitioner is not entitled to relief on this ground.

## VI. Mitigating Circumstances – Ineffective Assistance.

The petitioner complains that, because counsel raised no objection before

the trial judge regarding her failure to consider and find mitigating circumstances, the CCA reviewed the argument only for plain error. He further complains that, because appellate counsel framed the argument solely in terms of *Lockett* and its progeny, the CCA did not consider whether the trial judge abused her discretion in failing to find any mitigating circumstances. (Doc. 13 at 89-90). The respondent says the claim is unexhausted and procedurally defaulted because the petitioner did not present it to any state court. (Doc. 52 at 80-82). The petitioner again invokes *Martinez* to excuse his admitted procedural default. (Doc. 55 at 45). As discussed in Part IV, *Martinez* does not apply to the failure of the petitioner's Rule 32 appellate counsel to raise this claim, which precludes him from showing cause for his procedural default.

Nor could this claim succeed even if it were not procedurally defaulted. Pretermitting analysis of counsel's performance, it is clear that there is no reasonable probability that the CCA would have vacated the death sentence had counsel proceeded in the manner the petitioner identifies. The CCA reviewed the *Lockett* claim for plain error but, as discussed in Part V, it did so using the correct analysis for such claims, and using that analysis it reached the correct conclusion in finding that the trial judge considered all mitigating evidence. Altering the standard of appellate review could not have altered the outcome of the appeal as to this issue. And for reasons discussed in Part V, it is plain that the trial judge did not abuse her discretion in failing to find any mitigating circumstances.

Because this claim is procedurally defaulted and the petitioner is unable to show cause for the default, and because he has not shown he was prejudiced by counsel's allegedly deficient performance, he is not entitled to relief on this ground.

## VII.  Failure to Instruct the Jury as to Heat-of-Passion Manslaughter.

The petitioner argues that the trial judge violated his due process rights by failing to instruct the jury on heat-of-passion manslaughter. (Doc. 13 at 90-95).

Because the petitioner incorporated his argument regarding this claim into his argument regarding his related ineffective assistance claim, (Doc. 55 at 17 & n.32), the Court has largely addressed this claim in Part II. What the Court said there applies here as well.

The constitutional right allegedly violated was recognized in *Beck*, where the Supreme Court held that a death sentence cannot constitutionally be imposed "when the jury was not permitted to consider a verdict of guilt of a lesser-included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627 (emphasis added). As discussed in Part II, the CCA ruled that, as a matter of Alabama law, the evidence would not have supported such a verdict, and the petitioner has mounted no effective habeas challenge to that ruling. Because the petitioner has shown no violation of *Beck*, he cannot obtain federal habeas relief.

As noted by the respondent, the petitioner's claim fails to satisfy *Beck* for a second reason. "The goal of the *Beck* rule … is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *Spaziano v. Florida*, 468 U.S. 447, 455 (1984), *overruled in part on other grounds, Hurst v. Florida*, 136 S. Ct. 616 (2016); *accord Bobby v. Mitts*, 563 U.S. 395, 398 (2011). The Supreme Court thus has rejected the proposition that "the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included noncapital offense supported by the evidence." *Schad v. Arizona*, 501 U.S. 624, 646 (1991). Thus, so long as the jury is instructed on some lesser included offense as to which the evidence would have supported a conviction, the jury is not faced with an impermissible all-or-nothing choice, and the Constitution does not require instruction regarding additional lesser included offenses. *Id*. at 647-48; *accord Maples v. Allen*, 586 F.3d 879, 894-95 (11th Cir. 2009), *rev'd on other grounds*, 565 U.S. 266 (2012).

The petitioner's jury was charged on several lesser-included offenses, including murder and felony murder. As discussed in Part I.A, it was unlikely that the jury would convict on either of these charges, but the evidence would have supported such a verdict. Indeed, the petitioner insists that the trial evidence made non-capital murder a "highly viable" result. (Doc. 13 at 30). The petitioner does not argue that he can nevertheless satisfy *Beck*.

Instead, the petitioner turns to *Mullaney v. Wilbur*, 421 U.S. 684 (1975), for the proposition that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Id*. at 703. The *Mullaney* Court did not address the *Beck-Schad* issue but only the constitutionality of a state rule placing the burden on the defendant to prove he acted in the heat of passion. *Id*. Moreover, the state's burden under *Mullaney* is triggered only when an issue regarding heat of passion "is properly presented"; when, as here, under state law there is no acceptable evidence of legal provocation, the issue is not properly presented.

The petitioner also turns to *Mathews v. United States*, 485 U.S. 58 (1988), which states that, "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor," and that "[a] parallel rule has been applied in the context of a lesser included offense instruction …." *Id*. at 63. *Mathews* and the authorities on which it relies (all involving prosecutions by the federal government) did not rest on constitutional principles but on the development of the common law and its rough codification in Federal Rule of Criminal Procedure 31(c). *Id*. (Rule 31(c)); *Keeble v. United States*, 412 U.S. 205, 208 (1973) (common law and Rule 31(c)); *Sansone v. United States*, 380 U.S. 343, 349 (1965) (Rule 31(c)). Only *Keeble* mentioned due process, and it did so only to say that a construction of the statute under review that would preclude charging on any lesser included offense and thus offer the jury only two options (acquittal

or conviction of the most serious offense) – the exact situation addressed in *Beck* and *Schad* – "would raise difficult constitutional questions." 412 U.S. at 213. Indeed, the *Beck* Court quoted at length from *Keeble* to set the table for its constitutional ruling. 447 U.S. at 634.

In summary, the petitioner had no constitutional right to a jury charge on heat-of-passion manslaughter. Accordingly, he is not entitled to relief on this ground.

## VIII.  Improper Jury Argument and Instruction.

"It is well settled that only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity." *Johnson v. State*, 823 So. 2d 1, 54 (Ala. Crim. App. 2001) (internal quotes omitted). The petitioner argues that the prosecutor improperly argued to the jury that it should reject the mitigating circumstance of no significant criminal history on the grounds the petitioner had a history – none of it culminating in criminal conviction – of using and selling illegal drugs and of stealing from his ex-wife. He argues that the trial judge independently erred, and failed to counter the prosecutor's improper argument, by failing to instruct the jury that it could not consider anything other than convictions in evaluating this mitigating circumstance. (Doc. 13 at 95-96).

The petitioner did not assert this claim on direct appeal to the CCA, but that tribunal addressed it *sua sponte*. The CCA acknowledged the error but ruled that it was harmless beyond a reasonable doubt because: (1) the petitioner had two felony drug convictions; (2) as a matter of Alabama law, such a record precluded the trial judge from finding the mitigating circumstance; and (3) as a matter of logic and consistency, if the trial judge could not properly find the mitigating circumstance, neither could the jury. 896 So. 2d at 628-30. The petitioner argues that this rationale violates *Lockett* and its progeny because it precludes the jury from considering and finding this mitigating circumstance. (Doc. 13 at 97-98).

The respondent argues that this claim is procedurally defaulted because the petitioner did not present it to the Alabama Supreme Court. (Doc. 52 at 92-93). The petitioner replies that he did so, (Doc. 55 at 49), but it is clear he did not do so in the sense required by exhaustion analysis.

"[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Lucas v. Secretary, Department of Corrections*, 682 F.3d 1342, 1352 (11ᵗʰ Cir. 2012) (internal quotes omitted). "Thus, a petitioner could not satisfy the exhaustion requirement merely by presenting the state court with all the facts necessary to support the claim, or by making a somewhat similar state-law claim." *Id.* (internal quotes omitted). Rather, "we must look to [the petitioner's] state court briefs to determine whether he mentioned the federal source of law on which he relies or a case deciding such a claim on federal grounds, or … labeled the claim 'federal.'" *Id.* (internal quotes omitted).

The petitioner's petition for writ of certiorari and brief in support contain no suggestion that his claim (identified therein as Issue VII) presented a federal constitutional issue. Both make four statements, none supported by citation to any legal authority: (1) only convictions can be used in determining if a defendant has a significant criminal history; (2) therefore, the prosecutor's argument that non-convictions can be so used was improper; (3) limited to convictions, the petitioner does not have a significant criminal history; and (4) therefore, the mitigating circumstance applies and the trial judge's error was not harmless.[121] As reflected in the CCA's opinion, each of the legal propositions embedded in this argument is a child of state law. *See* 896 So. 2d at 628-30 (citing Alabama cases for the propositions that only convictions can be considered, that the existence of prior convictions negates the mitigating circumstance, and that harmless error analysis

---

[121] (Doc. 32-2 at 37; Doc. 36-2 at 102).

applies in capital cases).  Nothing in the petitioner's presentation of this argument hinted even faintly at a federal constitutional claim.[122]

In summary, the petitioner's claim is unexhausted.  Because he has not attempted to show cause and prejudice for the resulting procedural default, he is not entitled to relief on this ground.

## IX.  Insufficiency of the Evidence Regarding Aggravating Circumstance.

As noted in Part II.A, the state argued as a statutory aggravating circumstance that "[t]he capital offense was especially heinous, atrocious, or cruel compared to other capital offenses."  Ala. Code § 13A-5-49(8).  The jury was instructed as to this aggravating circumstance but, because the jury was not required to specify the findings underlying its recommendation,[123] it cannot be determined whether it found this aggravating circumstance.  In imposing a sentence of death, the trial judge expressly found this aggravating circumstance to

---

[122] The petitioner's one-paragraph argument regarding Issue VII referred the reader to Issue IV for the limited purpose of showing that he "does not have a significant criminal record."  (Doc. 32-2 at 37; Doc. 36-2 at 102).  Issue IV explains that the petitioner has only the two felony drug convictions and posits that a "significant" criminal history requires a substantially worse record.  (Doc. 32-2 at 31; Doc. 36-2 at 86).

The argument in Issue IV continues that, "[i]n the alternative, this statute is unconstitutional because it is applied in an arbitrary and capricious manner in violation of the 14th Amendment because no one, particularly the jury[,] knows what significant means."  (Doc. 32-2 at 31-32; Doc. 36-2 at 86).  Because Issue VII referred to Issue IV only for the argument that two felony drug convictions do not constitute a significant criminal history, it did not encompass the alternative constitutional claim.  Even had it done so, the constitutional claim referenced in Issue IV is not the claim the petitioner now presents.  Issue IV addressed the constitutional ramifications of uncertainty as to whether two felony drug convictions constitute a significant criminal history.  The instant claim addresses (at the CCA level) the constitutional ramifications of certainty that two such convictions do constitute such a history and (at the trial level) the constitutional ramifications of allowing the jury to consider non-convictions as criminal history.

[123] (Doc. 25-7 at 2).

exist.[124] The petitioner argues that the evidence presented was insufficient for either the jury or the trial judge to find this aggravating circumstance beyond a reasonable doubt and that this evidentiary insufficiency renders his death sentence unconstitutional. (Doc. 13 at 98-102). The CCA ruled that the trial judge's finding of this aggravating circumstance was "supported by the evidence," 896 So. 2d at 647, but the petitioner says this ruling is entitled to no deference because it is based on an unreasonable determination of the facts and because it represents an unreasonable application of *Maynard v. Cartwright*, 486 U.S. 356 (1988). (Doc. 13 at 102).

In *Maynard*, the Supreme Court addressed an Oklahoma statute that, like Section 13A-5-49, listed as an aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." 486 U.S. at 359. The Supreme Court held that, without any limiting statutory definitions or judicial constructions of these terms, the factfinder's discretion to find this aggravating circumstance as a basis for imposing the death penalty was not sufficiently channeled to satisfy the Eighth Amendment. The Court did not specify the content of a constitutionally acceptable descriptor of the aggravating circumstance. *Id*. at 361-64.

Alabama has limited the term "especially heinous, atrocious, or cruel" to "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Clark*, 896 So. 2d at 596 (internal quotes omitted). This limiting interpretation has been upheld as "consistently limiting [the aggravating circumstance] to a relatively narrow class of cases" in accordance with *Maynard*. *Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir. 1989). The petitioner agrees that this is the correct and constitutionally satisfactory construction of the aggravating circumstance, (Doc. 13 at 100), and the trial judge instructed the jury as to this construction.[125]

---

[124] (Doc. 15-2 at 8-9).

[125] (Doc. 25-5 at 7).

The petitioner objects, however, that in order to show a murder was "unnecessarily torturous" to the victim, "[i]t is necessary that the State present evidence that the victim suffered some type of physical violence beyond that necessary or sufficient to cause death." *Barksdale v. State*, 788 So. 2d 898, 908 (Ala. Crim. App. 2000). "Additionally, to support this aggravating factor, the time between at least some of the injurious acts must be an appreciable lapse of time, sufficient enough to cause prolonged suffering, and the victim must be conscious or aware when at least some of the additional or repeated violence is inflicted." *Id*. The petitioner argues that the evidence was insufficient to permit the jury or trial judge to find all these things beyond a reasonable doubt. (Doc. 13 at 101-02).

"We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 – if the settled procedural prerequisites for such a claim have otherwise been satisfied – the applicant is entitled to habeas relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis in original). "[I]n determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation, we think the more appropriate standard of review is the 'rational factfinder' standard established in *Jackson* …." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990). "Moreover, a federal court should adhere to the *Jackson* standard even when reviewing the decision of a state appellate court that has independently reviewed the evidence …." *Id*. at 783.

A petitioner thus can pursue a constitutional claim based on the insufficiency of the evidence regarding an aggravating circumstance, but such a

claim is based on *Jackson* and *Lewis*, not *Maynard*.[126]  Nor could the CCA have unreasonably applied *Maynard*, since that case merely requires a constitutionally adequate limiting construction of "especially heinous, atrocious, or cruel" and the Eleventh Circuit has ruled that Alabama's limiting construction – which was used in this case – satisfies *Maynard*.[127]

The question under *Jackson* and *Lewis* is whether any rational trier of fact, viewing the evidence in the light most favorable to the state, could have found: (1) that Ewing suffered violence beyond that necessary or sufficient to cause his death; (2) that he was conscious or aware when at least some the additional or repeated violence was inflicted; and (3) that he survived long enough to experience prolonged suffering.  The correct answer is plainly in the affirmative.

---

[126] Such a claim is possible, but it is far from clear that the petitioner has presented such a claim.  While *Maynard* requires a constitutionally adequate limiting construction, *Lindsey* establishes "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim" as satisfying *Maynard*.  The further refinement of "unnecessarily torturous" in *Barksdale* thus does not appear to be constitutionally required.  Review under *Lewis* is limited to whether the sentencer "has properly found the existence of a constitutionally narrowed aggravating circumstance."  497 U.S. at 780.  Since Alabama's aggravating circumstance is constitutionally narrowed independent of the *Barksdale* criteria, it is uncertain whether review under *Lewis* can properly address the *Barksdale* requirements rather than the undefined term, "unnecessarily torturous."  Because the respondent advances no argument along these lines, the Court proceeds to address the petitioner's claim.

[127] According to *Lindsey*, *Maynard* also requires that the sentencer's finding of a properly limited aggravating circumstance "must not have subverted the narrowing function of those words by obscuring the boundaries of the class of cases to which they apply."  875 F.2d at 1514.  According to *Bradley v. Nagle*, 212 F.3d 559 (11th Cir. 2000), this means the finding must not be "clearly erroneous."  *Id*. at 571; *accord Marquard v. Secretary, Department of Corrections*, 429 F.3d 1278, 1317 (11th Cir. 2005).  It does not appear that this "clearly erroneous" standard survives.  *See, e.g., Richmond v. Lewis*, 506 U.S. 40, 46-47 (1992) (setting forth the "well defined" Eighth Amendment principles that *Maynard* requires a limiting construction and that *Jackson* and *Lewis* provide the standard of review of the factfinder's application of the narrowing construction in a particular case).  In any event, for the reasons discussed in text the finding that Ewing's murder satisfied the aggravating circumstance was not clear error.

The petitioner argues the evidence establishes that the stab wound to Ewing's heart was the fatal wound and that it was the last wound inflicted. Thus, he concludes, Ewing did not suffer violence beyond that necessary or sufficient to cause his death. Any argument to the contrary, he asserts, is pure speculation. Similarly, any argument that Ewing experienced "prolonged" suffering is likewise speculative. (Doc. 13 at 101-02). The petitioner by his silence concedes the second *Barksdale* requirement.[128]

Dr. Riddick testified that the heart wound would have proved independently fatal – not simply from blood loss but because the lost blood would collect in the pericardial sac surrounding the heart and eventually create too much pressure for the heart to continue pumping.[129] Although he could not say when in the fight sequence this stab occurred,[130] a person with this wound would have been able to continue fighting for another two or three minutes.[131] Dr. Riddick also testified that Ewing died from the totality of the stabs and cuts; even absent the heart wound, he would have bled to death if unattended for a long time.[132]

It is clear from this evidence that a rational factfinder could find that Ewing suffered violence beyond that necessary or sufficient to cause his death. Because he could continue struggling for several minutes after being stabbed in the heart, his collapse outside the store does not prove that he was stabbed in the heart

---

[128] The petitioner also suggests the evidence was insufficient to support this aggravating circumstance because "[t]he evidence was undisputed that [his] behavior was driven by cocaine intoxication and/or cocaine withdrawal and his resulting misperception that Mr. Ewing was attacking him." (Doc. 13 at 99). As discussed elsewhere in this opinion, it was far from undisputed that the petitioner acted under the misguided, crack-induced belief that Ewing was attacking him, and a rational factfinder certainly could find that the petitioner was, and knew he was, at all times the sole assailant.

[129] (Doc. 21-1 at 12-13, 19-20).

[130] (*Id*. at 27).

[131] (*Id*. at 12, 23).

[132] (*Id*. at 15, 19-20).

immediately beforehand; on the contrary, it is more likely that he collapsed because he was approaching that point, several minutes after the blow, when his heart could no longer continue its function. Moreover, the petitioner admitted he stabbed Ewing once *or twice* outside the store; thus, even if that is when he stabbed Ewing in the heart, by his own testimony it would be perfectly reasonable to conclude that he stabbed Ewing elsewhere after the heart wound. Finally, because Dr. Riddick testified that the other wounds were independently sufficient to kill Ewing, the heart wound exceeded that necessary or sufficient to cause Ewing's death even if it was the final blow.

Unable to sustain his position based on the evidence presented, the petitioner turns instead to the state's closing argument which, he says, reveals that the petitioner did nothing more than try to kill Ewing and simply persisted until he was successful. If that is so, the petitioner suggests, he could not have inflicted more violence than necessary or sufficient to cause death. (Doc. 13 at 101-02). The petitioner is confusing the infliction of violence sufficient to cause death with the infliction of violence sufficient to satisfy the killer that the victim will die. That the petitioner continued stabbing Ewing until he collapsed does not mean that he used no more force than necessary to kill Ewing but, at most, only that he stopped using force once it became clear to him that Ewing could not survive.

As noted, Dr. Riddick testified that Ewing would have been able to continue struggling for two to three minutes after being stabbed in the heart. After Ewing collapsed, the petitioner says he walked from his car back to the store (a distance of about twenty feet), entered the store, retrieved the money bag and walked back out to the car. He took the gas nozzle out of the car, laid it on the ground, entered the car and drove slowly away. The petitioner in his statement acknowledged that Ewing was still alive and conscious at this point, and Iles confirmed this. There is no question but that a rational factfinder could find beyond a reasonable doubt that Ewing survived the final attack by several minutes, and the initial attack by several more, and that he was conscious throughout. The

petitioner appears to believe that "prolonged" suffering requires a longer time interval, but it does not. *See Shanklin*, 187 So. 3d at 809 (third *Barksdale* factor satisfied when the victim "lived for several minutes after being shot four times in the back"); *Stallworth v. State*, 868 So. 2d 1128, 1136, 1186 (Ala. Crim. App. 2001) (third *Barksdale* factor satisfied when the victim was stabbed six times behind the counter at a gas station/convenience store, including two defensive blows and one blow that severed her spinal cord); *id*. at 1175 ("We have approved the application of this aggravating circumstance when the testimony established that the victims were stabbed multiple times and that they suffered before their deaths.").

The petitioner argues that both Dr. Riddick and the CCA acknowledged that Ewing "could have" survived the heart stab by several minutes, and he insists it is thus pure speculation whether Ewing did survive several minutes. (Doc. 13 at 102). In fact, Dr. Riddick testified that the "most conservative" estimate of Ewing's survival after the heart stab was "probably two to three minutes."[133] While the CCA described Dr. Riddick's testimony as that Ewing "could have" lived several minutes after the stab to the heart, 896 So. 2d at 647, what matters is the actual evidence before the finder of fact, not the CCA's characterization of it. Dr. Riddick's testimony did not leave it speculative as to whether the petitioner survived the heart wound by several minutes.

As noted, the CCA ruled that the trial judge's finding of this aggravating circumstance was "supported by the evidence." 896 So. 2d at 647. Contrary to the petitioner's suggestion, this is neither an unreasonable determination of the facts in light of the evidence nor an unreasonable application of *Maynard*. On the contrary, the Court fully agrees with the CCA's ruling.

In summary, the evidence was constitutionally sufficient that Ewing's murder was especially heinous, atrocious or cruel compared to other capital cases. Accordingly, the petitioner is not entitled to relief on this ground.

---

[133] (Doc. 21-1 at 23).

**X. *Ring* Violation.**

"Capital defendants, no less than noncapital defendants, … are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring v. Arizona*, 536 U.S. 584, 589 (2002). The *Ring* Court overruled a previous Supreme Court precedent "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Id*. at 609. The petitioner argues that his death sentence violates *Ring* because the trial judge rather than the jury found the aggravating circumstances resulting in the sentence and because she rather than the jury weighed the aggravating circumstances against the mitigating circumstances. (Doc. 13 at 103).

The jury convicted the petitioner of the capital offense of murder "during a robbery in the first degree." Ala. Code § 13A-5-40(2). That verdict exposed the petitioner to a sentence of life imprisonment. *Id*. § 13A-5-45(f). The Alabama Legislature conditions an increase in the maximum punishment for that offense, from life imprisonment to death, on the presence of at least one statutory aggravating circumstance. *Id*. One of those circumstances is that the capital offense was committed while the defendant was engaged in the commission of, or in flight from committing, a robbery. *Id*. § 13A-5-49(4). Because it determined in the guilt-innocence phase that the murder was committed during a robbery, the jury found the aggravating circumstance necessary to make the petitioner eligible for the death penalty.

Although unnoted by the parties, the Eleventh Circuit has rejected the petitioner's contrary position. In *Lee v. Commissioner, Alabama Department of Corrections*, 726 F.3d 1172 (11th Cir. 2013), the petitioner argued that his death sentence violated *Ring* because the trial judge rather than the jury "(1) found the specific aggravating fact that authorized the death penalty; and (2) concluded that the aggravating fact outweighed the mitigating circumstances." *Id*. at 1197.

The *Lee* Court disposed of the first argument along the lines set forth above.  As here, the jury convicted the petitioner of murder under Section 13A-5-40(2), which "necessarily includes a finding that the aggravating circumstance in § 13A-5-49(4) is present."  726 F.3d at 1198.  Indeed, that conclusion is compelled by the statutory provision that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."  Ala. Code § 13A-5-45(e).  "Nothing in *Ring* – or any other Supreme Court decision – forbids the use of an aggravating circumstance implicit in a jury's verdict."  726 F.3d at 1198.  On the contrary, the Supreme Court clearly contemplates such a result.  *See Brown v. Sanders*, 546 U.S. 212, 216 (2006) ("This narrowing requirement [of *Furman v. Georgia*, 408 U.S. 238 (1972)] is usually met when the trier of fact finds at least one statutorily defined eligibility factor at *either the guilt or penalty phase*.") (emphasis added).

"The holding of *Ring* is narrow:  the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury.  That occurred in [the petitioner's] case by virtue of the jury's capital robbery-murder verdict.  *Ring* goes no further …."  *Lee*, 726 F.3d at 1198.  In particular, "*Ring* does not foreclose the ability of the trial judge to find the aggravating circumstances outweigh the mitigating circumstances."  *Id*.  As in *Lee*, the petitioner "points to no Supreme Court precedent that has extended *Ring*'s holding to forbid the aggravating circumstance being implicit in the jury's verdict or to require that the jury weigh the aggravating and mitigating circumstances."  *Id*.

While ignoring *Lee*, the petitioner argues he was "not eligible" for the death penalty "until the trial court *independently* found at least one aggravating circumstance, considered and found any applicable mitigating circumstances, and weighed them against each other."  (Doc. 13 at 104 (emphasis in original); *accord id*. at 105).  The petitioner misunderstands what is meant by "eligible."  A

defendant becomes "eligible" for the death penalty once he has been convicted of a capital offense and the jury has found at least one statutory aggravating circumstance beyond a reasonable doubt. *E.g., Brown*, 546 U.S. at 216. That is precisely what occurred here.

The CCA reached this claim on the merits and ruled that the jury's finding of guilt on the charge of capital robbery-murder satisfied *Ring*. 896 So. 2d at 653-57. As reflected above, this is not contrary to, or an unreasonable application of, *Ring*; accordingly, that ruling cannot be revisited in this tribunal.

In summary, there was no violation of *Ring*, and the petitioner is not entitled to relief on this ground.

## XI. *Brady* Violation.

During trial, the prosecutor disclosed to trial counsel that a police officer was prepared to testify that the petitioner told him he didn't have to kill Ewing because Ewing would have let him charge the gas on credit.[134] The prosecutor later questioned Dr. Rosenzweig about this statement.[135] The petitioner considers this statement exculpatory because it indicates he had no reason to kill Ewing and thus did not intend to do so. (Doc. 13 at 107).[136] The petitioner concludes that "a *Brady* violation has already been established," and he asks for discovery of the prosecutor and various law enforcement agencies. (*Id*.).

The petitioner does not assert a *Brady* claim. Instead, he seeks discovery to investigate a possible *Brady* claim. The respondent complains that the petitioner waited too long to seek discovery and that any *Brady* claim is unexhausted in any event. (Doc. 52 at 114-15).

---

[134] (Doc. 21-1 at 193).

[135] (Doc. 23-2 at 54).

[136] The argument overlooks the money bag, which the petitioner admittedly took, as a reason to kill Ewing.

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
> > (A) the claim relies on –
> > > …
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). While couched in terms of evidentiary hearings, Section 2254(e)(2) has been applied to discovery as well. *E.g., Isaacs v. Head*, 300 F.3d 1232, 1249 (11th Cir. 2000).

"Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court …." *Id*. at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 437.

There could hardly be a more complete lack of diligence than is here presented. Disclosure of alleged *Brady* material occurred on the record and in the presence of trial counsel. The prosecutor expressly identified the material as previously undisclosed, and Dr. Rosenzweig herself argued its exculpatory nature.[137] The petitioner acknowledges that these facts alone established a *Brady* violation. (Doc. 13 at 107). Yet not then, not on motion for new trial, not on direct appeal, and not on collateral state review did the petitioner ever assert a *Brady* claim or seek any discovery or evidentiary hearing regarding a possible

---

[137] (Doc. 23-2 at 54-56).

*Brady* claim.  In light of the information available, as described above, the petitioner made no reasonable attempt – indeed, no attempt at all – to investigate and pursue a *Brady* claim in state court.  The petitioner attempts to blame his Rule 32 counsel for this failure, (Doc. 55 at 54), but Section 2254(e)(2) applies to fault "attributable to … the prisoner's counsel." *Williams*, 529 U.S. at 432.

The petitioner's lack of diligence is not necessarily fatal.  "[L]ack of diligence will not bar an evidentiary hearing if efforts to discover the facts would have been in vain … and there is a convincing claim of innocence …." *Williams*, 529 U.S. at 435.  That is, the petitioner may still obtain discovery if he can satisfy subparagraphs (A) and (B) of Section 2254(e)(2).  The petitioner, however, does not claim he can do so, and it seems plain he cannot.  There is no reason to believe he would have been refused discovery had he sought it in a timely manner in the state courts, and he has identified no *Brady* material he might have discovered that would be so overpowering in its probative value as to make it clear that no reasonable jury would have convicted him of capital murder had it been timely disclosed; certainly the alleged *Brady* material identified above does not remotely approach that demanding level.

As noted, the petitioner has yet to assert a *Brady* claim.  Any such claim is thus unexhausted.  The petitioner does not deny that any *Brady* claim is procedurally defaulted, but he invokes *Martinez* as providing cause excusing the default.  (Doc. 55 at 53).  As discussed in Part III, *Martinez* and *Trevino* cannot provide cause with respect to any claim other than ineffective assistance of counsel.

In summary, the petitioner is not entitled to discovery regarding a possible *Brady* claim, and any such claim is in any event procedurally defaulted beyond hope of revival.  Accordingly, the petitioner is not entitled to relief on this claim.

## CONCLUSION

The petitioner prays generally for discovery and an evidentiary hearing, (Doc. 13 at 108), but he identifies nothing to which this request pertains other than possible *Brady* material. The Court has rejected that request for reasons set forth in Part XI. Because the petitioner has not satisfied Rule 6 or Section 2254(e)(2) with respect to any other contemplated but unidentified discovery or evidentiary hearing, because the state court record as reviewed under Section 2254(d) precludes habeas relief, and because the record precludes habeas relief independent of Section 2254(d), his request for discovery and an evidentiary hearing is **denied**.

The petitioner also prays for issuance of the writ. (Doc. 13 at 108). For the reasons set forth above, his amended petition for writ of habeas corpus is **denied** in its entirety. Judgment shall be entered accordingly by separate order.

Pursuant to Rule 11(a), a certificate of appealability ("COA") is **denied** as to all claims presented. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As to claims rejected on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As to claims rejected on procedural grounds, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*. The Court concludes that jurists of reason would not find debatable either the Court's procedural rulings or its assessment of the constitutional claims.

DONE and ORDERED this 2nd day of January, 2018.

s/WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE